**Raymond PROFFITT**

v.

**The MUNICIPAL AUTHORITY OF the BOROUGH OF MORRISVILLE, et al.**

**Civ. A. No. 86–4604.**

United States District Court,
E.D. Pennsylvania.

June 22, 1989.

Randall J. Brubaker, Philadelphia, Pa., for plaintiff.

Denis W. Lanctot, Morrisville, Pa., for defendants.

MEMORANDUM

RAYMOND J. BRODERICK, District Judge.

The Federal Water Pollution Control Act, also known as the Clean Water Act (the "Act"), 33 U.S.C. § 1251 *et seq.*, was enacted in 1972 to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." § 1251(a). In order to achieve this goal, "§ 301(a) of the Act makes unlawful the discharge of any pollutant into navigable waters except as authorized by specified sections of the Act." *Gwaltney of Smithfield v. Chesapeake Bay Foundation,* 484 U.S. 49, 108 S.Ct. 376, 379, 98 L.Ed.2d 306 (1987). One of these specified sections, § 402, established the National Pollutant Discharge Elimination System ("NPDES"). § 1342. Pursuant to § 402(a), the Environmental

Protection Agency ("EPA") may issue permits authorizing the discharge of specified levels of effluents from point sources by permit holders. § 1342(a). Pursuant to § 402(b), each State may establish and administer its own permit program if the program conforms to federal guidelines and is approved by the EPA. § 1342(b). In both instances, the "permit defines, and facilitates compliance with, and enforcement of, a preponderance of a discharger's obligations under the [Act]." *E.P.A. v. Cal. ex rel. State Water Resources Control Board*, 426 U.S. 200, 205, 96 S.Ct. 2022, 2025, 48 L.Ed.2d 578 (1976).

The holders of federal or state NPDES permits are subject to enforcement action by the EPA for failure to comply with the conditions of the permit. 33 U.S.C. §§ 1319, 1342(b)(7). In the absence of federal or state enforcement, § 505 authorizes private citizens to commence civil actions against any person or entity "alleged to be in violation" of the "conditions of either a federal or state NPDES permit." § 1365(a)(1). The citizen suit is intended to supplement governmental enforcement by authorizing citizens to act as "private attorneys general" in seeking to enforce the Act. *Middlesex County Sewerage Authority v. National Sea Clammers*, 453 U.S. 1, 14, 101 S.Ct. 2615, 2623, 69 L.Ed.2d 435 (1981).

Pursuant to § 505 of the Act, plaintiff Raymond Proffitt, on June 21, 1985, notified each of the defendants (municipalities and individuals alleged to be in violation of the NPDES permit) of his intention to file a citizen's suit to enforce the terms and conditions of the Morrisville Sewage Treatment Plant NPDES Permit No. PA-0026701. *See* 33 U.S.C. § 1365(b). The aforementioned permit was issued by the Pennsylvania Department of Environmental Resources ("DER"), on December 7, 1982, to defendant Morrisville Authority of the Borough of Morrisville ("Morrisville Authority"). Morrisville Authority owns and operates a 5.6 million gallons per day ("MGD") sewage treatment plant which discharges into the Delaware River. The plant receives sewage from a sewage collection system serving Morrisville Borough, Yardley Borough, Falls Township, and Lower Makefield Township.

On August 16, 1985, some fifty-six days following plaintiff's notice of intent to file a citizen suit, Morrisville Authority entered into a Consent Order and Agreement ("CO & A") with DER in which Morrisville Authority, *inter alia*, both admitted it was in violation of the NPDES permit and agreed to undertake certain measures designed to upgrade its sewage treatment plant in order to come into compliance with the NPDES permit. The CO & A stated, in pertinent part, that "since December, 1982, ... the Authority has consistently not been able to meet the effluent limits of the NPDES permit." In addition, the CO & A mandated the following compliance schedule:

July 1, 1986: Completion of all interim plant improvements

March 2, 1988: Completion of physical plant construction

July 1, 1988: Compliance with NPDES permit discharge limitations

On May 12, 1986, the DER issued separate enforcement orders to the Morrisville Authority and Lower Makefield Township directing each to proceed with an earlier plan to expand the capacity of the existing sewage treatment plant from 5.6 MGD to 7.1 MGD. On June 19, 1986, Morrisville Authority directed its consulting engineer to both prepare the necessary materials for use in an appeal of the May 12, 1986 DER Order as well as to proceed with the design of the expanded sewage treatment plant.

For approximately one year, plaintiff monitored the efforts by Morrisville Authority to achieve compliance with the CO & A. On July 22, 1986, the Morrisville Authority was granted by the DER, an extension in the interim deadlines for compliance contained in the CO & A. Additional extensions of interim deadlines were granted on September 5, 1986 and November 27, 1987. Actual construction of the expanded sewage treatment facility, mandated by the CO & A to be completed by March 1, 1988, did not commence until April 1988.

On August 1, 1986, plaintiff filed a complaint alleging violations of both the Clean Water Act as well as the Pennsylvania Clean Streams Law, 35 P.S. §§ 691.1 *et seq.* and seeking injunctive relief and civil penalties as provided by both statutes. Over the course of the next year, the parties engaged in periodic settlement negotiations while also litigating the action in this Court. On September 22, 1987, this Court granted partial summary judgment against defendant Morrisville Authority, declaring it to be in violation of the Act.

A non-jury trial was scheduled to commence on May 16, 1988 for the purpose of determining both the liability, if any, of the remaining defendants, as well as the nature of the injunctive relief and the amount of damages. On the day of trial, the parties reached an agreement in principle and so stated on the record. A Consent Decree was filed with this Court on June 23, 1988. On August 16, 1988, following the forty-five day review period mandated by 33 U.S.C. § 1365(c)(3), this Court entered the Consent Decree as a final judgment. The Consent Decree contained, *inter alia,* the following points:

(1) the defendants agreed to design, construct and operate the sewage treatment plant in compliance with the Clean Water Act and the Pennsylvania Clean Streams Law;

(2) the defendants agreed to be bound to a compliance deadline of July 1, 1990 irrespective of any extensions authorized by DER;

(3) defendants Morrisville Authority, Yardley, and Lower Makefield agreed to commit sufficient funding to implement the expansion and upgrading of the sewage treatment plant;

(4) defendant agreed to pay $75,000 in civil penalties and $10,000 for the creation of a monitoring fund; and

(5) defendants agreed to cooperate with plaintiff in testing for effluent limits, including the providing of effluent samples.

In addition, the Consent Decree provided that "defendants agree to pay plaintiff's reasonable attorney's fees and cost of suit in accordance with 33 U.S.C. § 1365(e)."

On October 5, 1988, plaintiff filed a petition for attorneys' fees and costs. On December 16, 1988, defendants filed their response to plaintiff's petition, arguing that plaintiff is not entitled to any award of attorneys' fees and expenses or, in the alternative, that this Court should reduce downward plaintiff's requested lodestar. Defendants simultaneously filed a motion to dismiss the complaint on the ground that because plaintiff presently lacks standing to prosecute a citizen suit, this Court is without subject matter jurisdiction to hear this case. In addition, defendants moved this Court to vacate its Order of September 22, 1987, granting partial summary judgment in favor of plaintiff against defendant Morrisville Authority as well as its Order of August 16, 1988, entering as a final judgment the June 23, 1988 Consent Decree. In this opinion, we consider and deny defendants' motion to dismiss.

## I.

It is well established that a basic justiciability element necessary for jurisdiction under Article III of the United States Constitution is "standing to sue", i.e., a sufficient stake in the controversy to obtain judicial resolution of it. *Jenkins v. McKeithen,* 395 U.S. 411, 421, 89 S.Ct. 1843, 1848–49, 23 L.Ed.2d 404 (1969); *Flast v. Cohen,* 392 U.S. 83, 94–101, 88 S.Ct. 1942, 1949–53, 20 L.Ed.2d 947 (1968). Indeed, as the Supreme Court held in *Allen v. Wright,* standing to sue is "perhaps the most important" doctrinal outgrowth of the constitutional case-or-controversy requirement. 468 U.S. 737, 750, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556, *reh'g denied,* 468 U.S. 1250, 105 S.Ct. 51, 82 L.Ed.2d 942 (1984). The concept of standing to sue "is surrounded by the same complexities and vagaries that inhere in [the concept of] justiciability" in general. *Flast v. Cohen,* 392 U.S. at 98, 88 S.Ct. at 1952. Nevertheless, the Supreme Court has delineated the basic outlines of the concept:

At an irreducible minimum, Art. III requires the party who invokes the court's authority to 'show that he personally has

suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant' and that the injury 'fairly can be traced to the challenged action' and 'is likely to be redressed by a favorable decision.' (citations omitted).

*Valley Forge College v. Americans United*, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982).

Standing can derive from either constitutional or statutory provisions. *Warth v. Seldin*, 422 U.S. 490, 500, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975). Indeed, the actual or threatened injury required by Article III may exist solely by virtue of "statutes creating legal rights, the invasion of which creates standing ..." *Linda R.S. v. Richard D.*, 410 U.S. 614, 617 n. 3, 93 S.Ct. 1146, 1148 n. 3, 35 L.Ed.2d 536 (1973). In such instances, standing exists where the plaintiff is "arguably within the zone of interests to be protected or regulated by the statute ... in question." *Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970).

Because it goes to the very power of the court to act, standing must exist at all stages of the proceeding, and not merely when the action is initiated. *DeFunis v. Odegaard*, 416 U.S. 312, 319, 94 S.Ct. 1704, 1707, 40 L.Ed.2d 164 (1974); *Roe v. Wade*, 410 U.S. 113, 125, 93 S.Ct. 705, 712, 35 L.Ed.2d 147 (1973). Accordingly, even where a prior determination of standing has been made, a party retains the right to challenge standing, and the Court must entertain such challenges at any point in the litigation. *Honig v. Doe*, 484 U.S. 305, 108 S.Ct. 592, 601, 98 L.Ed.2d 686 (1988); *see also United States Parole Com'n v. Geraghty*, 445 U.S. 388, 397, 100 S.Ct. 1202, 1209, 63 L.Ed.2d 479 (1980); *Safir v. Dole*, 718 F.2d 475, 481 (D.C.Cir.1983).

At the time of the commencement of the instant action, § 505 of the Act contained two relevant provisions directly bearing on the issue of standing to bring a citizen suit. *See* 33 U.S.C. §§ 1365(b)(1)(B); 1365(g). First, § 505(b)(1)(B) precluded the bringing of a citizen suit under the following circumstances:

> If the Administrator or State has commenced and is diligently prosecuting a civil or criminal action in a court of the United States, or a State to require compliance with the standard, limitation, or order ...

33 U.S.C. § 1365(b)(1)(B). Neither at the time of the commencement of the action, nor presently, has either the EPA or the DER prosecuted an action in any court concerning compliance by Morrisville Authority with Permit No. 1 PA–002671. Thus, § 505(b)(1)(B) did not, at the time of the commencement of the action, deprive plaintiff of standing to bring a citizen suit.

Second, § 505(g) defines the term "citizen" for purposes of bringing a citizen suit:

> For purposes of this section the term "citizen" means a person or persons having an interest which is or may be adversely impacted.

33 U.S.C. § 1365(g). In *Middlesex County Sewerage Authority v. National Sea Clammers*, 453 U.S. at 16, 101 S.Ct. at 2624, the Supreme Court stated that it "clear from the Senate Conference Report" that section 505 of the Act "was intended by Congress to allow suits by all persons possessing standing under this Court's decision in *Sierra Club v. Morton*, 405 U.S. 727 [92 S.Ct. 1361, 31 L.Ed.2d 636] (1972)." The major principle established by *Sierra Club v. Morton* was that standing may be based on an injury to non-economic interests, such as aesthetic, conservational or recreational values. 405 U.S. at 738, 92 S.Ct. at 1367. Accordingly, a plaintiff establishes standing by demonstrating that his health, recreational, aesthetic or environmental interests have been and will be directly and adversely affected by the allegedly illegal effluent discharges. *See e.g., Friends of the Earth v. Consolidated Rail Corp.*, 768 F.2d 57, 60–61 (2d Cir. 1985); *Chesapeake Bay Foundation v. American Recovery Co.*, 769 F.2d 207, 208–209 (4th Cir.1985).

Based upon the evidence of record, we find that plaintiff has proven that his health, recreational, aesthetic, and environ-

mental interests have been and will be directly and adversely affected by the allegedly illegal effluent discharges sufficient to establish standing under § 505(g) of the Act. On February 14, 1987, plaintiff submitted to this Court an affidavit in which he averred that he:

> Used and will continue to use the Delaware River in the vicinity of the Morrisville Authority Sewage Treatment Plant for ... recreation and enjoyment by boat, amphibious vehicle, airplane, and walking along the shore line ... [and that his] use and enjoyment has been and will be impaired and adversely effected by the discharges of the Morrisville Authority Sewage Treatment Plant in excess of its permit limits.

In addition, during a deposition taken by defendants, plaintiff clearly identified both the many uses he makes of the Delaware River as well as the injuries he experiences as a result of pollution. *Deposition of Raymond Proffitt* (May 18, 1987). Thus, it is clear that, pursuant to 33 U.S.C. §§ 1365(b)(1)(B) and 1365(g), plaintiff enjoyed standing to bring a citizen suit at the time he commenced this action.

Defendants, however, argue that even if plaintiff possessed standing to sue at the commencement of this citizen suit, such standing was revoked by operation of the February 1987 amendments to §§ 505(a) and 309 of the Act. *See* 33 U.S.C. §§ 1365(a) and 1319. Specifically, defendants contend that the amendments, effective February 4, 1987, bars plaintiff from *maintaining* the citizen suit commenced on August 1, 1986. For the reasons stated below, we conclude that defendants' position is without merit.

## II.

█ The 1987 amendments to the Act amended § 505(a) to read as follows:

> Except as provided in subsection (b) of this section *and section 1319(g)(6) of this title,* any citizen may commence a civil action on his own behalf. (amendment insertion underlined).

33 U.S.C. § 1365(a). The 1987 amendments also added a new section, § 309(g)(6)(A), which reads in pertinent part:

> [A]ny violation— ... (ii) with respect to which a State has commenced and is diligently prosecuting an action under a State law comparable to this subsection ... shall not be the subject of a civil penalty action under ... section 1365 of this title.

33 U.S.C. § 1319(g)(6)(A). Thus, subsection (A) bars a citizen suit when a state regulatory agency is pursuing an administrative action under a state law comparable to the Act. Prior to the adoption of this subsection, pursuant to § 505(b)(1)(B), only prosecutions *in court* acted to bar citizen suits.

Section 309(g)(6)(B), however, limits the applicability of § 309(g)(6)(A) with respect to citizen suits brought under § 505 of the Act. Section 309(g)(6)(B) provides:

> The limitations contained in subparagraph (A) on civil penalty actions under section 1365 of this title shall not apply with respect to any violation for which—
>
> (i) a civil action under section 1365(a)(1) of this title has been filed prior to commencement of the action under this subsection, or
>
> (ii) notice of an alleged violation of section 1365(a)(1) of this title has been given in accordance with section 1365(b)(1)(A) of this title prior to the commencement of an action under this subsection and an action under section 1365(a)(1) of this title with respect to such alleged violation is filed before the 120th day after the date on which such notice is given.

33 U.S.C. § 1319(g)(6)(B). Thus, by the terms of § 309(g)(6)(B), § 309(g)(6)(A) does not apply where the citizen suit is filed before the state administrative action commences, or the 60 day citizen suit notice is given before the commencement of the state administrative action and the citizen suit is filed before the 120th day after the date that notice was given.

As previously stated, defendants contend that § 309(g)(6)(A) revokes plaintiff's standing to maintain the instant citizen suit. Specifically, defendants contend that because the Commonwealth of Pennsylva-

nia commenced an administrative action prior to the initiation of plaintiff's citizen suit, plaintiff lacks standing to proceed. It is helpful to summarize the relevant dates:

June 21, 1985: Plaintiff sends 60-day notice of intent to file citizen suit

August 15, 1985: Consent Order and Agreement with Pennsylvania DER executed (commencement of administrative action)

May 12, 1986: DER issues orders to comply with the Sewage Facilities Plan

August 1, 1986: Plaintiff files citizen suit

February 4, 1987: Clean Water Act Amendments take effect

September 22, 1987: Court grants plaintiff partial summary judgment

The aforecited chronology note clearly establishes, and the parties agree, that neither of the § 309(g)(6)(B) exceptions to the applicability of § 309(g)(6)(A) are implicated in the present case. As to § 309(g)(6)(B)(i), it is clear that plaintiff did not file his citizen suit (August 1, 1986) prior to the commencement of the Pennsylvania DER enforcement action (August 15, 1985). As to § 309(g)(6)(B)(ii), while the sixty day notice was given (June 21, 1985) prior to the commencement of the DER administrative action (August 15, 1985), the filing of the citizen suit (August 1, 1986) was well beyond the 120th day after the giving of the notice (November 21, 1985). Thus, it is clear that, in the present case, the limitations of § 309(g)(6)(A) are unaffected by § 309(g)(6)(B).

Accordingly, the Court must determine whether § 309(g)(6)(A) operates to revoke plaintiff's standing to maintain the instant citizen suit. We hold that it does not. Both the language and legislative history of the 1987 amendments to as well as the public policy goals underlying the Act, suggest that Congress intended § 309(g)(6)(A) only to prospectively limit the commencement of citizen suits (in the delineated situations) and not, as defendants contend, to retroactively revoke the standing of plaintiffs to maintain citizen suits commenced

prior to the effective date of the amendments.

It is well established that retroactive application of a law is disfavored and a law will not be so construed unless it clearly states that intent. *United States v. Security Industrial Bank,* 459 U.S. 70, 79–81, 103 S.Ct. 407, 413, 74 L.Ed.2d 235 (1982). As the Supreme Court held in *Union Pacific R. Co. v. Laramie Stock Yards:*

> [T]he first rule of construction is that legislation must be considered as addressed to the future, not to the past ... The rule has been expressed in varying degrees of strength but always of one import, that a retrospective operation will not be given to a statute which interferes with antecedent rights ... unless such be 'the unequivocal and inflexible import of the terms, and the manifest intention of the legislature.

231 U.S. 190, 199, 34 S.Ct. 101, 102, 58 L.Ed. 179 (1913); *see also Sikora v. American Can Co.,* 622 F.2d 1116, 1119 (3d Cir. 1980); *United States v. Richardson,* 512 F.2d 105, 106 (3d Cir.1975); *Witter v. Pennsylvania National Guard,* 462 F.Supp. 299, 304 (E.D.Pa.1978); *see generally* 2 Sands, Sutherland on Statutory Construction, § 41.04 (4th ed. 1986); Smead, The Rule Against Retroactive Legislation: A Basic Principle of Jurisprudence, 20 Minn.L.Rev. 775 (1936).

A review of both the plain language and legislative history of the 1987 amendments in general, and § 309(g)(6)(A) in specific, not only fails to reveal an unequivocal legislative intent of retroactive application but, in fact, strongly suggests a congressional intent to prospectively apply § 309(g)(6)(A).

The Clean Water Act Amendments of 1987 added a new subsection (g), "Administrative Penalties" to the civil penalties section (§ 309) of the Act. Subsection (g) established a highly detailed procedure by which administrative penalties are to be assessed and adjudicated should the agency choose that option.[1] To the extent that

---

1. Prior to the 1987 Amendments, the EPA could only seek penalties through the Justice Depart-

ment. Clearly, the amendments permit a sim-

those procedures are implemented, there exists a narrowly defined prospective limitation with respect to citizen suits at subparagraph 309(g)(6)(A). Critically, § 309(g)(6)(A) does not discuss removal of jurisdiction already attached, but merely places a "limitation of actions under other sections." Such a conclusion is supported by the manner in which the 1987 amendments modified § 505 of the Act; the basic section authorizing citizen suits. As previously stated, the reference to § 309(g)(6) is inserted at § 505(a) with the explicit language placing a limitation on the phrase "any citizen may commence a civil action on his own behalf." The present tense use of the word makes it apparent that § 309(g)(6) would prospectively be a bar to the "commencement" of an action after that section was amended, but the wording does not remove a plaintiff's standing and the court's jurisdiction already attached to cases filed and in litigation at the time of the enactment of the amendments.

Similarly, the legislative history brought to this Court's attention warrants the conclusion that Congress did not intend § 309(g)(6)(A) to apply retroactively. In passing the new amendments, Congress recognized the critical importance of citizen suits to achieving the objectives of the Clean Water Act:

> Citizen suits are a proven enforcement tool. They operate as Congress intended to both spur and supplement to government actions. They have deterred violators and achieved significant compliance gains. In the past two years, the number of citizen suits to enforce NPDES permits has surged so that such suits now constitute a substantial portion of all enforcement under this Act.

Report of the Senate Committee on Environment and Public Works, S.99–50 at 27 (May 14, 1985) (hereinafter S.99–50). It was in recognition of the importance of citizen suits that Congress molded the language of § 309(g)(6)(A):

> This amendment therefore strikes a balance between two competing concerns: the need to avoid placing obstacles in the

pler procedure with fewer internal reviews for

path of such citizen suits and the desire to avoid subjecting violators of the law to dual enforcement actions or penalties for the same violation. It states that *no one may bring an action* to recover civil penalties under sections 309(b) and (d), 311(b), or 505 of this Act for any violation with respect to which the Administrator has commenced and is diligently prosecuting an administrative civil penalty action. (emphasis added).

*Id.* at 28. Indeed, as Senator John Chafee noted:

> [§ 309(g)(6)(A) ] is not intended to lead to the disruption of any Federal Judicial penalty action then underway, but merely indicates that a Federal judicial civil penalty action or a *citizen suit is not to be commenced* if any administrative penalty proceeding is already underway. (emphasis added).

133 Cong.Rec. 5737 (daily ed. Jan. 14, 1987). We note that Judge O'Neil, in *United States of America v. B.P. Oil, Inc.,* analyzed the legislative history of § 309(g) and concluded that the provision was not to be applied retroactively:

> The legislative history brought to my attention warrants the conclusion that Congress did not intend subsection 1319(g) to apply retroactively ... Accordingly. I conclude that the provision does not apply retroactively.

No. 86–0792 1989 WL 83623 (E.D.Pa. July 7, 1988) slip op. at 6–7.

Finally, defendants' proffered construction, to wit, retroactive application of § 309(g)(6)(A), is inconsistent with the congressionally mandated purpose underlying citizen suits. Congress' clear intention was to "encourage citizen participation rather than treat it as a curiosity or a theoretical remedy," that citizen plaintiffs are not to be treated as "nuisances or troublemakers" but rather as "welcomed participants in the vindication of environmental interests." *Friends of the Earth v. Carey,* 535 F.2d 165, 172 (2d Cir.1976). Congress did not intend to "frustrate citizen actions with procedural trickery." Rogers, Environ-

smaller cases.

mental Law, § 1.13 (1977). Prompt resolution, through citizen suits, of cases involving significant pollution of our nation's waterways, is not served by permitting amendments effective February 4, 1987 to bar a plaintiff from maintaining a citizen suit properly commenced on August 1, 1986. Accordingly, because we conclude that § 309(g)(6)(A) does not operate to revoke plaintiff Proffitt's standing to maintain the instant citizen suit, this Court will deny defendants' motion to dismiss.

We note that plaintiff has presented a second, independent ground in support of his position that § 309(g)(6)(A) does not operate to revoke his standing to maintain the instant citizen suit. Specifically, plaintiff argues that because the Pennsylvania Clean Streams Law, 35 P.S. § 691.605(a), the state law under which the DER commenced its administrative action, is not comparable to the Clean Water Act, § 309(g)(6)(A), even were it to be applied retroactively, would not revoke plaintiff's standing to maintain his citizen suit. *See* Remarks of Senator John Chafee, 133 Cong.Rec. 5737 (daily ed. Jan. 14, 1987). Inasmuch as the Court has determined that § 309(g)(6)(A) does not apply retroactively, we will not address plaintiff's second ground.