**Karen WHITE, Individually and as Personal Representative of the Estate of Kenneth V. White, Deceased, Plaintiff,**

**v.**

**MOSES TAYLOR HOSPITAL, Defendant.**

**Civ. No. 89–1588.**

United States District Court, M.D. Pennsylvania.

April 9, 1991.

Todd J. O'Malley, Frank Anthony Mazzeo, Ronald J. Worobey, Scranton, Pa., for plaintiff.

Brian M. Peters, Jonathan B. Sprague, Post & Schell, James B. Jordan, Shrager, McDaid, Loftus, Flum & Spivey, Philadelphia, Pa., for defendant.

## MEMORANDUM

NEALON, District Judge.

The Hill–Burton Act, 42 U.S.C. § 291 *et seq.*, (hereinafter Hill–Burton or the Act), requires medical facilities that are recipients of its funds to assure a reasonable amount of uncompensated services, determined by a formula based on a percentage of operating costs or of federal assistance provided, to patients who are deemed unable to pay according to prescribed income guidelines.[1] In this action, plaintiff seeks generally to enforce the "assurances" of uncompensated services made by Moses Taylor Hospital (hereinafter Hospital) under the Act and, in particular, to obtain

personal relief from medical costs incurred by her husband. Presently before the court is defendant's motion to dismiss all counts in the complaint of the above-captioned case for failure to state a claim upon which relief may be granted pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons that follow, the court will grant defendant's motion to dismiss plaintiff's Second, Third, Fourth, Fifth and Sixth Causes of action, and deny defendant's motion to dismiss plaintiff's First Cause of Action.

## I. BACKGROUND

### A. Facts

In September of 1984, Kenneth V. White, the deceased husband of plaintiff, was hospitalized at the defendant Hospital and incurred medical bills totaling $217,321.00 before his death.[2] Plaintiff avers that the Hospital, contrary to the regulations promulgated by the Secretary of Health and Human Services (hereinafter Secretary), notified neither her husband nor herself, and failed to post notices of the availability of uncompensated services to those patients who were eligible and sought such services.[3]

Because plaintiff did not pay the medical bills, the Hospital instituted a collection action against her, as administratrix of her husband's estate, in the Court of Common Pleas of Lackawanna County. Due to plaintiff's failure to respond to the action in County Court, a judgment was entered against her for $217,321.00. Plaintiff complains, throughout this process, that she possessed inadequate resources to pay expenses owed to the Hospital, that she was unaware of any potential free or reduced cost medical services, and that the Hospital failed to provide notices detailing the availability of Hill–Burton funds or to provide

---

1. *See* discussion *infra* pp. 779–785.

2. For the purposes of the instant motion, the court, in setting forth the factual history of this case, must accept all well-pleaded allegations of the complaint as true. *Kuchka v. Kile,* 634 F.Supp. 502, 505 (M.D.Pa.1985) (Nealon, C.J.). Thus, the court's recitation of the facts is derived from the complaint.

3. The eligibility requirements of individuals for the Hill–Burton funds are provided in 42 C.F.R. § 124.505. For the purposes of this motion only, the court will consider her to have satisfied the eligibility criteria delineated in Section 124.505, since the hospital has not expressly contested this in its motion.

written notice to her of those same funds in violation of 42 C.F.R. § 124.504.[4]

After the default judgment was entered, plaintiff learned of the availability of the free or reduced cost health care and applied to the Hospital for relief. The Hospital allegedly denied those funds to her and additionally failed to provide a written determination of her eligibility as required by 42 C.F.R. § 124.507.[5]

### B. Procedural History

In April of 1989, plaintiff filed a complaint with the Secretary against the Hospital for failing to comply with its Hill–Burton obligations. *See* document 1 of record, Exhibit A. On July 19, 1989, the Assistant Surgeon General for the United States Department of Health and Human Services informed plaintiff that her complaint was dismissed, but that "[u]nder section 1627 of the Public Health Service Act (42 U.S.C. 300s–6) after a complaint has been dismissed, the person who filed the complaint may bring a private right of action in court to effectuate compliance by the facility with the regulations." Document 10 of record, Exhibit A; *see also* document 1 of record at ¶ 23.[6]

On May 8, 1989, plaintiff obtained a stay of the collection proceedings in the Court of Common Pleas. On November 3, 1989, plaintiff initiated this instant suit, on her own behalf and as personal representative of the Estate of Kenneth V. White, to compel Moses Taylor to abide by their obligation to provide free or low cost medical care to eligible individuals. In her complaint, plaintiff, in addition to seeking punitive damages, posits six causes of action: (1) violation of the Hill–Burton Act; (2) denial of due process under the Fifth and Fourteenth Amendments of the United States Constitution; (3) breach of contract; (4) denial of equal protection under the Fifth and Fourteenth Amendments; (5) violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law 73 Pa.Stat.Ann. § 201, *et seq.;* and (6) violation of the Civil Rights Act, 42 U.S.C. § 1983 (Section 1983).[7] *See* document 1 of record. On February 28, 1990, defendant filed its motion to dismiss together with a supporting brief. *See* documents 6 & 7 of record. After plaintiff and defendant filed their respective briefs in support of and opposition to the pending motion, the court held several hearings and conferences. During the last hearing in late December, 1990, the court extended defendant additional time to conduct further research and to submit any additional briefs. The court has been informed that no further submissions will be forthcoming which would affect this motion. All documents necessary for consideration of the present motion are before the court. Accordingly, the motion is now ripe for disposition.

## II. DISCUSSION

On a motion to dismiss for failure to state a claim upon which relief can be granted, the burden of proof lies with the moving parties. *Johnsrud v. Carter,* 620 F.2d 29, 33 (3d Cir.1980). The court, in ruling upon a Rule 12(b)(6) motion, must accept all well-pleaded allegations of the

---

**4.** Section 124.504 provides for three types of notices:

 (a) *Publish notice.* A facility shall publish in a newspaper of general circulation in its area notice of its uncompensated services obligation before the beginning of its fiscal year....

 (b) *Posted notice.* (1) The facility shall post notices, which the Secretary supplies in English and Spanish, in appropriate areas in the facility, including but not limited to the admissions areas, the business office, and the emergency room....

 (c) *Individual written notice.* (1) In any period during a fiscal year in which uncompensated services are available in the facility, the facility shall provide individual written notice of the availability of uncompensated services to each person who seeks services in the facility on behalf of himself or another....

**5.** Again, for the purposes of this motion, there is *no dispute as to this assertion.*

**6.** The letter by Dr. Lassek, informing her of her private right of action, was inadvertently omitted from the complaint by plaintiff.

**7.** For the sake of clarity, the court will discuss the federal claims (*i.e.* Hill–Burton and constitutional and Section 1983 claims), state claims (*i.e.* breach of contract and unfair trade practices claims), and punitive damages in that order.

complaint as true and construe them in a light most favorable to the non-moving parties. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Truhe v. Rupell,* 641 F.Supp. 57, 58 (M.D. Pa.1985) (Rambo, J.). The motion should be granted only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Hosp. Bldg. Co. v. Trustees of Rex Hosp.,* 425 U.S. 738, 746, 96 S.Ct. 1848, 1853, 48 L.Ed.2d 338 (1976) (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957)).

### A. Federal Claims

#### 1) Hill–Burton Claim

A brief background outlining the origin of the Hill–Burton Act and the ensuing adoption of regulations implementing the Act may be instructive.[8] Congress, in 1946, enacted Title VI of the Public Health Service Act, commonly known as the Hill–Burton Act. Generally, the Act was intended to address problems with the adequacy and distribution of health service facilities by means of a program of grants-in-aid to the States. *See* Statement of Senator Hill, in Hearings on S. 191 before the Senate Comm. on Education and Labor, 79th Cong., 1st Sess. 6–9 (1945). The expressed purpose of the Act, aside from stimulating the development of new or improved medical facilities and promoting research, was:

> to assist the several States in the carrying out of their programs for the construction and modernization of such public or other nonprofit community hospitals and other medical facilities as may be necessary, in conjunction with existing facilities, to furnish adequate hospital, clinic, or similar services to all their people....

42 U.S.C. § 291(a). A State wishing to participate in this program and receive federal assistance was required to submit a plan to the Surgeon General[9] (now the Secretary of Health and Human Services), for his approval. 42 U.S.C. § 291d.

Most importantly to the issues presented in this litigation, the Hill–Burton act required that:

> The Surgeon General ... shall by general regulations prescribe—
>
> (e) that the State plan shall provide for adequate hospitals, and other facilities for which aid under this part is available, for all persons residing in the State, and adequate hospitals (and such other facilities) to furnish needed services for persons unable to pay therefor. Such regulations may also require that before approval of an application for a project is recommended by a State agency to the Surgeon General for approval under this part, assurance shall be received by the state from the applicant that (1) the facility or portion thereof to be constructed or modernized will be made available to all persons residing in the territorial area of the applicant; and (2) there will be made available in the facility or portion thereof to be constructed or modernized a reasonable volume of services to persons unable to pay therefor, but an exception shall be made if such a requirement is not feasible from a financial viewpoint.

42 U.S.C. § 291c(e). The second of the two "assurances"—requiring a state plan to furnish necessary services to persons unable to pay—is the one implicated in this case. Under Section 291c(e), the Surgeon General could require as a condition of approval that the State give an "assurance" that there be made available a reasonable volume of services to persons unable to pay.

The regulations issued pursuant to enforcing these "assurances" essentially mirrored the language of the statute for near-

---

**8.** A more extensive description of the evolution of Hill–Burton and the supporting regulatory scheme is provided in both opinions in *American Hosp. Ass'n. v. Harris,* 625 F.2d 1328 (7th Cir.1980).

**9.** The Office of the Surgeon General was abolished in 1966 and all functions were transferred to the Secretary of Health, Education, and Welfare [now Secretary of Health and Human Services]. 1966 Reorg. Plan No. 3, § 3, 31 Fed.Reg. 8855.

ly thirty years. *See American Hosp. Ass'n v. Schweiker*, 721 F.2d 170, 173 (7th Cir.1983), *cert. denied*, 466 U.S. 958, 104 S.Ct. 2169, 80 L.Ed.2d 553 (1984) (citing 42 C.F.R. §§ 52.61–53.63 (Supp.1947)). Despite the "uncompensated care assurance" requirement, hospitals receiving the federal aid routinely ignored their responsibility to provide charitable care. *Id.* In response to this reluctance by hospitals, the Secretary in 1972 issued regulations which contained more definite standards to determine compliance with the "assurance" obligations. *See* 42 C.F.R. §§ 53.111, 53.113 (1974). Moreover, in 1975, Congress passed Title XVI of the Public Service Act, 42 U.S.C. § 300q *et seq.*, which mandates, rather than permits, regulations enforcing the "assurances". *See* 42 U.S.C. § 300s–1(b)(1)(K). Further, Section 300s–6 firmed up the enforcement mechanism of the Hill–Burton Act, stating:

> The Secretary shall investigate and ascertain, on a periodic basis, with respect to each entity which is receiving financial assistance under this subchapter or which has received financial assistance under subchapter IV of this chapter or this subchapter, the extent of compliance by such entity with the assurances required to be made at the time such assistance was received. If the Secretary finds that such an entity has failed to comply with any such assurance, the Secretary shall report such noncompliance to the health systems agency for the health service area in which such entity is located and the State health planning and development agency of the State in which the entity is located and shall take any action authorized by law (including an action for specific performance brought by the Attorney General upon request of the Secretary) which will effect compliance by the entity with such assurances. An action to effectuate compliance with any such assurance may be brought by a person other than the Secretary only if a complaint has been filed by such person with the Secretary and the Secretary has dismissed such complaint or the Attorney General has not brought a civil action for compliance with such assurance within six months after the date on which the complaint was filed with the Secretary.

This statutory provision transferred the primary investigatory and enforcement power to the Secretary in order to better effectuate compliance by hospitals with their "assurance" to provide uncompensated services. The Secretary then promulgated stricter regulations in response to Title XVI. *See* 44 Fed.Reg. 29372–29410 (1979). Specifically relevant for this suit, a more stringent enforcement section was created which evolved into the regulations found in 42 C.F.R. §§ 124.511 & 124.512.[10]

While it is readily obvious that an explicit "private action" does exist under Section 124.511 to effect compliance with the assurances, it is not equally obvious as to the extent of the remedy a person may seek through that "private action". There ex-

---

**10.** Section 124.511 states in pertinent part:

(a) *Complaints.* A complaint that a facility is out of compliance with the requirements of this subpart may be filed with the Secretary by any person.

\* \* \* \* \* \*

(4) Section 1627 of the Act provides that if the Secretary dismisses a complaint or the Attorney General has not brought an action for compliance within six months from the date on which the complaint is filed, the person filing it may bring a private action to effectuate compliance with assurance. If the Secretary determines that he/she will be unable to issue a decision on a complaint or otherwise take appropriate action within the six month period, the Secretary may, based on priorities for the disposition of complaints that are established to promote the most effective use of enforcement resources, or on the request of the applicant, dismiss the complaint without a finding as to compliance prior to the end of the six month period, but no earlier than 45 days after the complaint is filed.

Section 124.512(b) states in relevant part:

A facility ... that has denied uncompensated services to any person because it failed to comply with the requirements of this subpart will not be in compliance with this assurance until it takes whatever steps are necessary to remedy fully the noncompliance, including:

(1) Provision of uncompensated services to applicants improperly denied;

(2) Repayment of amounts improperly collected from persons eligible to receive uncompensated services; and

(3) Other corrective actions prescribed by the Secretary.

ists some case law holding that a person cannot sue the Secretary directly in order to compel him to enforce the regulations. *See, e.g., Gillis v. United States Department of Health and Human Services,* 759 F.2d 565 (6th Cir.1985); *Davis v. Ball Memorial Hosp. Ass'n,* 640 F.2d 30 (7th Cir. 1980). Here, however, plaintiff is not seeking such relief but, instead, has initiated a suit directly against the Hospital.[11] This action raises two significant questions for our purposes: (1) Does plaintiff have a "private action" that encompasses personal relief; and (2) Does compliance by the Hospital require providing individual remedies under the regulations promulgated by the Secretary (*i.e.* does compliance necessarily include providing uncompensated services to applicants improperly denied, repayment of amounts improperly collected, or the cessation, in whole or part, of a collection action).

It must first be resolved whether a private cause of action exists directly under Hill–Burton and its regulations which allows for a personal remedy, as plaintiff now contends.[12] In reviewing the statute and regulations the court cannot find any provision permitting a person to bring a private cause of action for personal relief. In the context of this issue, both the statute and regulations are very explicit in restricting the "private action" to only effectuating a medical facility's compliance with its assurances. *See* 42 U.S.C. § 300s–6 ("*An action to effectuate compliance with any such assurance* may be brought by a person other than the Secretary ...*"*); 42 C.F.R. § 124.511(a)(4) ("the person filing it may bring *a private action to effectuate compliance* with the assurance"). Moreover, the extensive regulations, including the limited "private action", do not mention any private remedy for personal redress. *See cf. Oldfield v. Athletic Congress,* 779 F.2d 505, 508 (9th Cir.1985) ("The presence in the [Amateur

Sports Act of 1978] of administrative mechanisms for the resolution of disputes over an athlete's right to compete still further betokens the absence of an implied private right."). Finally, neither the legislative nor the administrative history reveals any intent on the part of Congress or the Secretary to provide a person with any such remedy beyond that of the limited "private action" to effectuate compliance.

Additionally, the design of the enforcement scheme also militates against finding that plaintiff has a personal cause of action directly under the Act or the regulations. *See* 42 U.S.C. § 300s–6; 42 C.F.R. §§ 124.-511(a)(4) & 124.512(a). The enforcement provisions in both the statute and regulations were devised to empower the Secretary with the primary investigatory and enforcement authority. If the Secretary finds that a medical facility has failed to comply, he may bring an action which will secure compliance by the facility with its "assurances" or he may request that the Attorney General institute an action for specific performance to achieve compliance. 42 U.S.C. § 300s–6; 42 C.F.R. § 124.512(a). In the absence of enforcement by the Secretary, a person other than the Secretary may then bring a "private action" to effectuate compliance, but only if he first files a complaint with the Secretary and the Secretary dismisses that complaint or the Attorney General has not brought a civil action to effect compliance. 42 U.S.C. § 300s–6; 42 C.F.R. § 124.511(a)(4). This particular provision allows the Secretary to prioritize the complaints "to promote the most effective use of [his] enforcement resources." 42 C.F.R. § 124.511(a)(4). The "private action" supplements the enforcement power of the Secretary by authorizing a person to act as a "private attorney general" in seeking to effectuate a medical facility's compliance with its "assurance" to provide uncompensated services to those unable to pay.

---

11. Although a person may not bring a suit directly against the Secretary, courts have interpreted the "private action" provision of the Act to allow actions against the offending facility. *See, e.g., Barlow v. Marion County Hosp. District,* 495 F.Supp. 682, 691 (M.D.Fla.1980).

12. For purposes of clarity, plaintiffs effort in this case to be relieved of her debt to the Hospital will be referred to as her "personal" action.

By way of analogy, many environmental suits under the Clean Water Act, 33 U.S.C. § 1251 *et seq.* (CWA), are similarly initiated by persons acting as a "private attorney general" to seek enforcement of the act. *See, e.g., Pennsylvania Envtl. Defense Found. v. Bellefonte Borough,* 718 F.Supp. 431, 434 (M.D.Pa.1989); *Proffitt v. Municipal Auth. of Morrisville,* 716 F.Supp. 837, 839 (E.D.Pa.1989). The enforcement provisions found in Section 1365 of CWA are comparable to those found in Hill–Burton, in that Hill–Burton requires the person to first file a complaint with the Secretary and if the Secretary dismisses the complaint and elects not to pursue the case, the person may initiate an action to effectuate compliance. Furthermore, under Section 1365, a person may commence an action to enforce an effluent standard or limitation only if he first notifies the Administrator of the Environmental Protection Agency (Administrator) and the State in which the violation occurred, and where the Administrator or State is not diligently prosecuting a civil or criminal action in court. As under Hill–Burton, CWA gives the government the "primary responsibility for insuring that [it] is properly enforced." *Id.* The district court in *Bellefonte* concluded that the purpose of a suit brought by person acting as a private attorney general under the purview of the CWA "is to protect and advance the public's interest in pollution free waterways rather than to promote private interests." *Id.; see also Proffitt,* 716 F.Supp. at 839 (citing *Middlesex County Sewerage Auth. v. National Sea Clammers,* 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981)) ("The citizen suit is intended to supplement governmental enforcement by authorizing citizens to act as 'private attorneys general' in seeking to enforce the act.")

While Hill–Burton obviously was not enacted to achieve pollution free waterways, it was enacted for an equally important public interest—that is, to construct and modernize medical facilities and furnish adequate medical care to all people. *See* 42 U.S.C. § 291. Accordingly, this court finds that a person does act as a "private attorney general" when he/she brings a "private action" under Hill–Burton to vindicate the public's health and welfare—namely the Hospital's "assurance" to provide uncompensated services. Hence, the plaintiff cannot institute a "private action" with any more remedial authority than that which the Secretary or the Attorney General possesses. Thus, since the statute and regulations explicitly enable the Secretary and the Attorney General to bring an action at law only to effectuate compliance, the plaintiff is likewise restricted to enforcing the Hospital's compliance with its "assurances" and may not seek personal relief.[13]

Having determined that a personal cause of action does not exist, the court must consider whether a "private action" to effect compliance might benefit the plaintiff if compliance would include the cessation of a collection action, repayment of amounts improperly collected, and provision of uncompensated services improperly denied. The extent of what a person may acquire as relief when he/she attempts to enforce the medical facility's compliance with its assurance is not very clear. In other words, should the court determine whether a person may initiate an action under Sections 124.511 and 124.512 to enforce a hospital's "assurance" which would coincidentally forgive absolutely and completely her personal debt?[14] This is a

---

**13.** The court is cognizant that while it interprets the statute (Section 300s–6) and the regulations (Sections 124.511 & 124.512) to preclude a personal cause of action, the court does interpret them to permit a person to bring a "private action" to effectuate compliance with the Hospital's "assurances", which may result in a beneficial spin-off to an individual to be repaid that which was improperly collected or to be provided uncompensated services which were improperly denied. The extent of the appropriate remedy for such a "private action", however, must still be analyzed in further briefs. *See infra.*

**14.** This is a different question from the one asked regarding a personal cause of action. Rather, this query acknowledges that plaintiff has a "private action" to effectuate compliance generally, but asks whether *effecting compliance* would result in the forgiving of plaintiff's debt to the Hospital.

question of first impression. The court in its research has not found any cases confronting this issue; nor has either party revealed any.

■ Before reaching the issue of whether a "private action" to effectuate compliance would encompass the forgiving of plaintiff's debt because of the Hospital's failure to notify the plaintiff of its obligation, certain preliminary questions must be answered. First, under Section 124.-512(b)(1) & (2), on which plaintiff heavily relies, compliance is limited to the "[p]rovision of uncompensated services to applicants *improperly denied*" and to the "repayment of amounts *improperly collected from persons eligible to receive uncompensated services.*" 42 C.F.R. § 124.512(b)(1) & (2) (emphasis supplied). In order to be "improperly denied" or to have payments "improperly collected," the person must be initially eligible to receive uncompensated services under both the guidelines for fiscal eligibility in Section 124.505 [15] and the facility's allocation plan as prescribed in 42 C.F.R. § 124.506.[16] This regulation states that, if a hospital fails to develop or publish its allocation plan, it must provide uncompensated services to all those applicants in Category A and Category B.[17] *Id.* at § 124.506(b)(2). This requirement applies only until the hospital has published a plan or until the facility appropriately ceases to provide uncompensated services under Section 124.508. Therefore, before plaintiff may obtain relief under Section 124.512, her eligibility

must first be established. This has not been addressed by either side, and may be more appropriately brought pursuant to a summary judgment motion.[18]

The next issue which requires consideration is the effect of the agreement entered into by the Hospital and the Secretary. In 1988, the Hospital was found to be out of compliance with its assurances because it had not submitted any documentation to verify that it had provided the requisite uncompensated services during prior years. The Hospital represented to this court that it entered into an agreement with the Secretary to bring the Hospital back into compliance through prospective actions, which included a calculation of the amount of services that had to be made available.[19] Hence, the Hospital argues, this suit to bring it into compliance is mooted because prospective compliance has already been arranged through the agreement with the Secretary. The record, however, has not been developed enough legally or factually for the court to evaluate these issues. For example, the agreement itself is not part of the record and the extent to which it might moot the issues herein has not been sufficiently addressed by the parties. Further argument is required concerning whether the Secretary has taken *exclusive* steps under Section 124.512 to compel the Hospital's compliance, thereby precluding this action in court. Also, the record is deficient as to whether the Hospital's obligation is confined to the amount of uncompensated services calculated by the Secre-

15. For example, besides the income criteria, third party coverage for medical services, including government programs, eliminates eligibility for uncompensated services. *See* 42 C.F.R. § 124.505(a)(1); 52 Fed.Reg. 46022 ("Eligibility Criteria").

16. In the Secretary's discussion of the changes in the regulations, he emphasized that a facility's allocation plan affects eligibility. 52 Fed. Reg. 46022 ("Eligibility Criteria").

17. Category A applies to those with incomes not greater than the poverty line issued by the Secretary pursuant to 42 U.S.C. § 9902, while Category B qualifiers must have an income greater, but not more, than twice the poverty line. 42 C.F.R. § 124.505(a)(2)(i) & (ii).

18. Specifically, the applicability of the federal medical assistance program, commonly known as Medicaid, should be addressed—viz., whether plaintiff is eligible for assistance under that program and, if so, the effect it has on her eligibility to receive uncompensated services under Hill–Burton. *See supra* note 14; 42 C.F.R. 124.505(a).

19. While it has not been stated, the court assumes that the agreement was entered into pursuant to Section 124.512(a) ("If the Secretary finds, based on his/her investigation under § 124.511, that a facility did not comply with the requirements of this subpart, the Secretary may take any action authorized by law to secure compliance, including but not limited to, voluntary agreement . . .").

tary in the agreement or whether an individual may seek enforcement through Section 124.512(b) resulting in relief that would require the Hospital to exceed its financial obligation. In considering that query, attention must be given to whether the Hospital has already fulfilled its financial obligation under that agreement and has, thereby, provided all the required uncompensated services, so as to render this case moot.[20] Since the current record is critically lacking in information concerning these issues, the court will provide the parties additional time to develop the record and submit appropriate motions.

Furthermore, as to the administrative exhaustion issue raised by defendant, the record is similarly insufficient to make a determination. The Hospital contends that this particular compliance issue has not been presented to the Secretary, as set forth in Section 124.511. Additionally, the Hospital claims plaintiff has not sought a ruling from the Secretary on her eligibility to receive uncompensated services and, thus, is precluded from raising that issue here. The record does not reveal what precisely was presented to the Secretary pursuant to Section 124.511 or whether the administrative procedure is the sole remedy for securing a determination of her eligibility.[21] These, like other issues identified herein, cannot be adequately examined at this point of the proceedings and may be more suitable for a subsequent summary judgment motion.

The court would be in a better position to decide whether compliance by the Hospital would result in any personal relief for plaintiff, once the issues mentioned above are more fully explored by both sides. The question as to actual entitlement, if any, under the enforcement mechanism developed in the statute and regulations will have to await further expansion of the record and appropriate arguments as to the applicable law. It must be emphasized, however, as previously noted, that plaintiff has no personal cause of action which can be asserted directly under the statute or regulations. Nevertheless, the court will grant the parties twenty (20) days to file summary judgment motions which should address all issues necessary to resolve this case.[22] In that regard, it may be helpful to request the Secretary to consider submitting a brief and any other relevant documentation on these issues as *amicus curiae*. Copies of this Memorandum will be transmitted to the Secretary.

**2) Section 1983, Fifth Amendment and Fourteenth Amendment Claims**

 Plaintiff alleges that she was denied her due process and equal protection rights as guaranteed by Section 1983 and the Fifth and Fourteenth Amendments.[23] A

---

**20.** The court acknowledges that the Court of Appeals for the Seventh Circuit has noted that "[a] patient's right to uncompensated services will depend upon an ability to demonstrate facts necessary both to show eligibility and to prove that the Hospital has or has not met its financial obligation for the year." *Davis*, 640 F.2d at 42.

**21.** At least one district court has confronted the exhaustion issue. *See Barlow*, 495 F.Supp. at 691. In *Barlow*, the court held that, because primary jurisdiction lies with the Secretary, plaintiffs seeking compliance must first pursue administrative remedies before initiating a civil action. *Id.*

**22.** Although the court grants the parties twenty (20) days to file a summary judgment motion, both parties are still subject to the briefing schedule and other provisions set out in Local Rule 401.

**23.** Section 1983 states in relevant part:
 Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured....
The Fifth Amendment states in pertinent part:
 No person shall ... be deprived of life, liberty, or property without due process of law.
The Fourteenth Amendment states in pertinent part:
 Section 1. All person born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

common thread throughout the interpretation and application of these constitutional and statutory provisions is the requisite implication of governmental action, rather than purely private conduct.[24] This preliminary requisite must exist before the court's analysis can proceed to the substance of the constitutional or federal law claim. *Rendell–Baker*, 457 U.S. at 838, 102 S.Ct. at 2769–2770. This principle "has become firmly embedded in our constitutional law that the action inhibited by the first section of the Fourteenth Amendment is only such action as may fairly be said to be that of the States." *Shelley v. Kraemer*, 334 U.S. 1, 13, 68 S.Ct. 836, 842, 92 L.Ed. 1161 (1948). "That Amendment erects no shield against merely private conduct, however discriminatory or wrongful." *Id.*

The Hospital merely mentions this issue without making a significant journey into the case law surrounding this area. *See* document 7 of record at 18. Plaintiff addresses this issue in the context of her Fifth and Fourteenth Amendment claims and expectedly argues that the Hospital's conduct relates to state action. In supporting her assertion, plaintiff erroneously states that the United States Court of Appeals for the Third Circuit has not confronted this precise issue, and that the United States Court of Appeals for the Fourth Circuit has found state action to exist where a hospital denied staff privileges to a physician. *See* document 18 of record.

The issue of whether an otherwise private hospital would be transformed essentially into a state actor merely by its receipt of Hill–Burton funds has arisen in many courts under circumstances involving a physician's ability to attain or maintain staff privileges at the hospital. Virtually every circuit has concluded that state ac-

tion does not exist under those circumstances. *See, e.g., Loh–Seng Yo v. Cibola General Hosp.,* 706 F.2d 306, 308 (10th Cir.1983); *Modaber v. Culpeper Memorial Hosp., Inc.,* 674 F.2d 1023, 1026 (4th Cir. 1982); *Newsom v. Vanderbilt University,* 653 F.2d 1100, 1115 (6th Cir.1981); *Hodge v. Paoli Memorial Hosp.,* 576 F.2d 563, 564 (3d Cir.1978); *Schlein v. Milford Hosp., Inc.,* 561 F.2d 427, 428–29 (2d Cir.1977); *Briscoe v. Bock,* 540 F.2d 392, 395–96 (8th Cir.1976). Even the Fourth Circuit has reached the same conclusion. *See Modaber,* 674 F.2d at 1026. Although the Fourth Circuit may have been originally one of the minority circuits to find the receipt of Hill–Burton funds to be sufficient to establish state action, *see, e.g., Simkins v. Moses H. Cone Memorial Hosp.,* 323 F.2d 959, 967–68 (4th Cir.1963), *cert. denied,* 376 U.S. 938, 84 S.Ct. 793, 11 L.Ed.2d 659 (1964), the circuit has since concluded, in light of *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974), that the contention that

the mere receipt of Hill–Burton Act funds makes the recipient's every act state action is inconsistent with *Jackson* ... Recipient hospitals undoubtedly "operate as integral parts of comprehensive joint or intermeshing state and federal plans or programs designed to effect proper allocation of available medical and hospital services for the best possible promotion and maintenance of public health." [Citation omitted]. But the mere fact that the hospitals implement a governmental program does not establish the nexus which *Jackson* requires. The recipients do not act in an exclusively state capacity. Although health care is certainly an "essential public service", it does not involve the "exercise by a private entity of powers traditionally exclu-

---

**24.** Of course, Section 1983 and the Fourteenth Amendment apply to actions fairly attributable to state or local government, while the Fifth Amendment applies to actions fairly attributable to the federal government. Plaintiff does not make this distinction; nor does she explain whether the Hospital is either a state or federal entity. Nevertheless, the distinction is irrelevant since identical standards are employed.

*See Mendez v. Belton,* 739 F.2d 15, 18 n. 1 (1st Cir.1984). Similarly, actions taken under color of state law, in Section 1983, are analyzed under the same standards required to demonstrate state action under the Fourteenth Amendment. *See Rendell–Baker v. Kohn,* 457 U.S. 830, 838, 102 S.Ct. 2764, 2769–70, 73 L.Ed.2d 418 (1982); *United States v. Price,* 383 U.S. 787, 794 n. 7, 86 S.Ct. 1152, 1157 n. 7, 16 L.Ed.2d 267 (1966).

sively reserved to the State." [Citations omitted].

674 F.2d at 1026 (Footnotes omitted).

Finally, the Third Circuit also confronted this issue in a like context as in those cases mentioned above, and reached a similar conclusion. *See Hodge*, 576 F.2d 563. In *Hodge*, a physician brought a claim under Section 1983, alleging his staff privileges and office lease at the hospital were terminated without due process of law and equal protection. *Id.* The Third Circuit Court of Appeals, in affirming the district court's dismissal for failure to state a claim upon which relief may be granted, held "that the receipt of Hill–Burton construction funding, Medicare and Medicaid funds, and the existence of a tax exemption, as well as state licensing requirements for nonprofit hospitals, do not constitute state action under 42 U.S.C. § 1983." [25] *Id.* at 564.

In concluding this matter, a brief study of *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974), and *Blum v. Yaretsky*, 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982), may be informative. In *Jackson*, a consumer sought relief under Section 1983 for termination of her electric service allegedly before she was afforded notice or a hearing. The privately owned electric company was extensively regulated by the state's Public Utility Commission, which included a right by the electric company to terminate service to any customer upon reasonable notice. In holding that conduct of the electric company was not translated into state action, the Supreme Court opined:

> The mere fact that a business is subject to state regulation does not itself convert its action into that of the State ... Nor does the fact that the regulation is extensive and detailed, as in the case of most public utilities, do so.... But the inquiry must be whether there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter

may be fairly treated as that of the State itself.

*Id.* 419 U.S. at 350–51, 95 S.Ct. at 453 (citations omitted). Through this closer scrutiny, the Court exhorted that neither a monopoly status granted to the company by the State, nor the fact that it provides an essential public service, nor that the State specifically authorized or approved the termination practice, especially given that the Public Utilities Commission did not specifically hold hearings on this particular provision of the company's tariff, would convert the electric company's every action into that of the State's. Lastly, the Court found absent the symbiotic relationship as that demonstrated between a private lessee leasing space for a restaurant from a state parking authority in *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961). 419 U.S. at 357–58, 95 S.Ct. at 456–57.

Again, in *Blum*, the Supreme Court was asked to consider a state action question regarding decisions by private nursing homes to transfer or discharge Medicaid patients. Under the Medicaid program established by Congress, federal financial assistance is provided to States that choose to reimburse certain medical costs incurred by the poor. 457 U.S. at 993–94, 102 S.Ct. at 2780. For an individual to obtain Medicaid assistance, he must be under a particular income level and seek medically necessary services. *Id.* at 994, 102 S.Ct. at 2780–81. To assure the satisfaction of the latter condition, a review panel of physicians was established to assess patients' continued eligibility. In this case, the private nursing home's review panel decided that the respondents no longer required the care they were receiving and should be transferred to a lower level of care. Once notified of this decision, New York officials, responsible for administering the Medicaid program, prepared to reduce or eliminate the Medicaid assistance to the nursing home. State social service officials affirmed the decision to discontinue the benefits following administrative hearings.

---

**25.** Since the examination into state action under the Fourteenth Amendment, government action under the Fifth Amendment, and "under color of state law" in Section 1983, involve the same inquiry, the analysis set forth in *Hodge* applies equally to each claim.

In examining the state action question, the Supreme Court delineated three principles as guideposts:

(1) "The complaining party must [ ] show that 'there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself;'" and "'the mere fact that a business is subject to state regulation does not by itself convert its action into that of the State for purposes of the Fourteenth Amendment.'" *Id.* at 1004, 102 S.Ct. at 2786 (quoting *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 350, 95 S.Ct. 449, 453, 42 L.Ed.2d 477 (1974).

(2) "[A] State normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State. Mere approval of or acquiescence in the initiatives of a private party is not sufficient to justify holding the State responsible for those initiatives under the terms of the Fourteenth Amendment." *Id.* (citations omitted).

(3) "[T]he required nexus may be present if the private entity has exercised powers that are 'traditionally the exclusive prerogative of the State.'" *Id.* at 457 U.S. 1005, 102 S.Ct. at 2786 (quoting *Jackson,* 419 U.S. at 353, 95 S.Ct. at 455).

Applying these principles, the court concluded that state action was not involved in the critical decision to terminate the Medicaid assistance. In so doing, the Court found the decisions complained about were made by physicians and nursing home administrators, all of whom are private parties, and that these decisions were not influenced by the State. *Id.* Also, the fact that federal regulations impose penalties on the nursing home for failing to comply with the regulations adds nothing to the claim since they do not dictate the decision to transfer or discharge. *Id.* at 1010, 102 S.Ct. at 2789. Moreover, government regulation of the private entity and State programs that result in substantial funding of the activities of the private entity are not persuasive in demonstrating that the State is responsible for the decisions made by the private entity. *Id.* at 1011, 102 S.Ct. at 2789. Finally, nursing homes do not perform a function that has been "traditionally the prerogative of the State." *Id.* (quoting *Jackson,* 419 U.S. at 353, 95 S.Ct. at 455).

*Blum* and the instant case are similar in that (1) government funds were provided to a private medical facility in connection with medical assistance to the underprivileged; (2) the free or reduced-cost medical care was allegedly denied the patient due to the actions of the private facility—in this case, the hospital purportedly failed to notify the patient of Hill–Burton funds, and in *Blum,* the nursing home determined that the patients no longer warranted the higher level of care which in turn prevented the patient from receiving the Medicaid support; (3) the government did not affirmatively command the alleged wrongful act; and (4) the funds were disbursed through a government program, regulated by the government which, for example, defined the eligibility standards for potential recipients. Additionally, there is no evidence, nor has plaintiff asserted in the case at bar, that the government is responsible for the alleged wrongful conduct challenged by plaintiff. This fact is something the Supreme Court relied on heavily in its analysis. *See id.* 457 U.S. at 1005, 1006–07, 1011, 102 S.Ct. at 2786, 2786–87, 2789.

■ As *Blum* and *Hodge* indicate, the simple fact that a hospital may receive federal funding and that the alleged wrongful activity may be related to a federal program is not sufficient to transform the actions of an ordinarily private entity into that of the State. Since this court has taken a view that no state action has occurred, it will be unnecessary to proceed any further in the analysis of plaintiff's due process and equal protection allegations.

■ Even if state action did exist in this context, the court would still be compelled to dismiss the Section 1983 claim. *See*

*Middlesex County Sewerage Auth.*, 453 U.S. 1, 101 S.Ct. 2615; *Lile v. University of Iowa Hosps. and Clinics*, 674 F.Supp. 288 (S.D.Iowa 1987). In *Lile*, the court reasoned that because the Hill–Burton statute "provides for administrative review by the Secretary, as well as private actions, with applicable rules promulgated thereunder," the Act is sufficiently comprehensive to demonstrate a congressional intent to preclude the remedy under Section 1983. 674 F.Supp. at 290 (citing in support *Smith v. Robinson*, 468 U.S. 992, 104 S.Ct. 3457, 82 L.Ed.2d 746 (1984); *Middlesex County Sewerage Auth.*, 453 U.S. 1, 101 S.Ct. 2615).

This court concurs in the analysis and conclusion of the *Lile* court, and utilizes this as further basis to dismiss the Section 1983 claim.

### B. Pendent State Claims

#### 1) Third Party Beneficiary

In plaintiff's third cause of action, she avers that the hospital entered into a contract with the United States when the Hospital accepted federal funds in return for providing uncompensated services to those unable to pay. As one of those unable to pay, she contends that she is an intended third party beneficiary.

The Hospital referred to *Murphy v. Villanova University*, 547 F.Supp. 512 (E.D. Pa.1982), *aff'd. mem*, 707 F.2d 1402 (3d Cir.1983), wherein a student maintained that he was a third party beneficiary of the College Work Study Program which provides for a funding from the United States government to the University. The student alleged that because the college received those funds, and he was a benefactor of the program, he necessarily became an intended beneficiary of the funding agreement. The district court observed:

> By agreeing to make employment equivalent to work-study employment "reasonably available ... to all students ... who desire employment," did Villanova "intentionally assume" the liability to third-party student beneficiaries for which plaintiff contends? ... Since the Secretary exacted this promise from Villanova at Congress' behest, and since Congress did not intend to create a statutory right of action on plaintiff's behalf, it would be anomalous indeed to construe the promise as one which the Secretary—or, *a fortiori*, Villanova—intended or understood as imposing on the University potential contract liability for such claims as [plaintiff] now brings.

*Id*. at 521.

The Hill–Burton Act differs, however, from that implicated in *Murphy*. Courts, even before an explicit private action was instituted, found indigent patients to benefit from the relationship between the government and the medical facility. *See, e.g., Saine v. Hosp. Auth. of Hall County*, 502 F.2d 1033 (5th Cir.1974); *Euresti v. Stenner*, 458 F.2d 1115 (10th Cir.1972); *Corum v. Beth Israel Medical Center*, 373 F.Supp. 550 (S.D.N.Y.1974); *Organized Migrants in Community Action, Inc. v. James Archer Smith Hosp.*, 325 F.Supp. 268 (S.D.Fla.1971); *Cook v. Ochsner Foundation Hosp.*, 319 F.Supp. 603 (E.D.La. 1970). With a view toward these cases, Congress implanted a private right of action which has evolved into the language now in dispute. To that degree, Congress did intend the third party patient to have a private action.[26]

**26.** One circuit has hinted that a contract does not exist between the government and a medical facility receiving Hill–Burton funds. *See American Hosp. Ass'n*, 721 F.2d at 182–183. In *American Hosp.*, the Seventh Circuit considered whether the Secretary acted within the scope of his statutory duty in promulgating the 1979 regulations. The hospital association claimed that the regulations impermissibly impaired the assisted hospitals' contractual rights. The court rejected the contract characterization opining that:

the relationship between the government and the hospitals here cannot be wholly captured by the term "contract" and the analysis traditionally associated with that term. Rather than a voluntary agreement negotiated between two parties, a grant-in-aid program like that under the Hill–Burton Act is an exercise by the federal government of its authority under the spending power to bring about certain public policy goals. The government acts by inducing a state or private party to cooperate with the federal policy by conditioning

■ Despite Congress' creation of a private cause of action, the court finds that private action in Section 300s–6 also reflects Congress' intention to create exclusive remedies for the enforcement of the statute which pre-empts and precludes any other form of action. The Supremacy Clause of the United States Constitution empowers Congress with the ability to pre-empt state law. *Louisiana Public Service Comm'n v. F.C.C.*, 476 U.S. 355, 368, 106 S.Ct. 1890, 1898, 90 L.Ed.2d 369 (1986).

> Pre-emption occurs when Congress, in enacting a federal statute, expresses clear intent to pre-empt state law, when there is outright or actual conflict between federal and state law, where compliance with both federal and state law is in effect physically impossible, where there is implicit in federal law a barrier to state regulation, where Congress has legislated comprehensively, thus occupying an entire field of regulation and leaving no room for the States to supplement federal law, or *where the state law stands as an obstacle to the accomplishment and execution of the full objectives of Congress.*

*Id.* at 368–69, 106 S.Ct. at 1898 (internal citations omitted) (emphasis supplied). Additionally, "[p]re-emption may result not only from action taken by Congress itself; a federal agency acting within the scope of its congressionally delegated authority may pre-empt state regulation." *Id.* at 369, 106 S.Ct. at 1899.

In *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 107 S.Ct. 805, 93 L.Ed.2d 883 (1987), the Supreme Court considered whether the State nuisance law was pre-empted by the Clean Water Act (CWA). The CWA established an extensive permit system designed to regulate the discharge of polluting effluents. To decide whether to issue the permit, the Administrator of the Environ-

mental Protection Agency had to balance the competing public and industrial use of the waterway. After opining that "[a] state law also is pre-empted if it interferes with the methods by which the federal statute was designed to reach [its] goal," *id.* at 494, 107 S.Ct. at 813, the Court found that the "application of [State] law ... would allow respondents to circumvent the [ ] permit system, thereby upsetting the balance of public and private interests so carefully addressed by the Act." *Id.* at 494, 107 S.Ct. at 813. It further concluded, "It would be extraordinary for Congress, after devising an elaborate permit system that sets clear standards, to tolerate common-law suits that have the potential to undermine this regulatory structure." *Id.* at 497, 107 S.Ct. at 814.

■ In this case, the Hill–Burton Act was established to construct and modernize medical facilities to furnish quality medical care and to make available a reasonable volume of medical services to persons unable to pay. 42 U.S.C. §§ 291 & 291c(e). A comprehensive regulatory scheme was developed to enforce the "assurance" under Hill–Burton to provide uncompensated services while maintaining the financial integrity of the medical facility. If this court permitted plaintiff to proceed with the contract claim, it would effectively sanction the plaintiff's circumvention of the administrative procedures which must be followed before initiating his/her private action and, thereby, would prevent the Secretary from having the opportunity to enforce the Hill–Burton obligation, something Congress explicitly intended.[27] Furthermore, if state law claims could be maintained without regard to the Hill–Burton regulations, it would disrupt the Secretary's balancing of the consumer's ability to obtain free medical services with the desire to not financial-

---

receipt of federal aid upon compliance by the recipient with federal statutory and administrative directives. *See Fullilove v. Klutznick,* 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980). The "conditions" of this arrangement are not the result of a negotiated agreement between the parties but rather are provided by the statute under which the program is administered.
*Id.*

27. The Secretary has been given the primary enforcement role of the Hill–Burton Act, as expressed in 42 C.F.R. § 300s–6. *See also* 44 Fed. Reg. 29396. By permitting state law claims separate from the private action in Section 300s–6, the patient could usurp the Secretary's authority.

ly overburden the medical facility. *See* 42 C.F.R. § 124.513. Also, allowing a state contract suit would potentially bankrupt hospitals and would contravene the policy of the Hill–Burton Act to furnish adequate medical care. Such an action based on state law would interfere with the implementation of the Hill–Burton Act, and thus is pre-empted. Accordingly, plaintiff's action must be restricted to the procedural mechanisms and limited private action established in the regulations. Plaintiff's third cause of action will be dismissed.

The court notes that this conclusion is somewhat irrelevant in the respect that even if plaintiff possessed a viable contract action, she could receive no more relief than what she could receive directly under the Hill–Burton Act and its regulations.

### 2) The Pennsylvania Unfair Trades Practices and Consumer Protection Law

██ Plaintiff, in her fifth cause of action, avers that the Hospital violated the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 Pa.Stat.Ann. § 201–1 *et seq.* (hereinafter CPL). Section 201–3 of the act declares "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce" to be unlawful. The CPL delineates seventeen different acts which may constitute "unfair or deceptive acts or practices." 73 Pa.Stat.Ann. 201–2.

In the complaint, plaintiff failed to specify which definition of "unfair or deceptive acts or practices" in Section 201–2 is applicable to her case. In reviewing these seventeen definitions, the court is unsure whether any of these provision would apply. It is not the court's responsibility to locate a cause of action under this statute for plaintiff.

In plaintiff's brief, however, she refers to Section 201–2(4)(xvii) which states that "unfair or deceptive acts or practices" means "[e]ngaging in any other fraudulent conduct which creates a likelihood of confusion or of misunderstanding." In utilizing this definition as a basis for her cause of action, she argues that "Defendant's fraudulent and mendacious conduct confused the Plaintiff and caused her to misunderstand the nature of the Defendant's Hill–Burton obligation." Document 18 of record. The essential element of this provision is fraud prevention. *Commonwealth by Creamer v. Monumental Properties, Inc.,* 459 Pa. 450, 329 A.2d 812 (1974). The Pennsylvania courts have defined fraud for purposes of this statute as "any kind of artifice employed by one person to deceive another." *Chatham Racquet Club v. Commonwealth,* 127 Pa.Cmwlth. 209, 561 A.2d 354 (1989) (quoting *Commonwealth v. National Apartment Leasing Co.,* 108 Pa. Cmwlth. 300, 306, 529 A.2d 1157, 1160–61 (1987)).

The court questions whether plaintiff has alleged this claim with enough specificity to withstand a motion to dismiss. Irrespective, this claim is still subject to dismissal for the same reason provided in the analysis disposing of the contract claim. As announced above, the comprehensive statutory and regulatory scheme implies Congress' intent to make a remedy under the Hill–Burton Act exclusive and the execution of this state statute would impede the implementation and policy of the Hill–Burton Act and its regulations. Consequently, this cause of action must also be dismissed.

The court again notes that even if this claim survived, she could obtain no more relief than that which she could receive directly under the Hill–Burton Act.[28]

---

**28.** Plaintiff requests this court to impose civil penalties in accordance with the CPL. Section 201–8 of the CPL affords civil penalties. However, this section only applies to actions brought by the Commonwealth's Attorney General or the appropriate District Attorney, acting in the name of the Commonwealth. *See* 73 Pa.Stat. Ann. § 201–8.

Under Section 201–9.2, a person bringing a private action is restricted to recovery of "actual

damages." "The court may, [however,] in its discretion award up to three times the actual damages sustained...." 73 Pa.Stat.Ann. § 201–9.2. Nonetheless, in light of the analysis undertaken by this court regarding the appropriate relief under Hill–Burton, the court would not deem the instant case as one appropriate for increasing the award threefold.

## C. Punitive Damages

 Plaintiff also prays for "punitive damages in an amount equal to a sum which will [ ] insure future compliance with the above act." Document 1 of record at 10–11. In this case, the court finds punitive damages to be totally unwarranted and, thus, will dismiss this portion of her complaint.[29]

### 1) Federal Claims

 "Punitive damages in general represent a limited remedy, to be reserved for special circumstances." *Savarese v. Agriss*, 883 F.2d 1194 (3d Cir.1989) (citing *Cochetti v. Desmond*, 572 F.2d 102, 105–06 (3d Cir.1979)). Such damages are rationalized principally on three grounds: (1) "[they] are 'assessed for the avowed purpose of visiting a *punishment* upon the defendant;'" (2) "[they] deter[ ] persons from violating the rights of others;" and (3) "[they] are justified as a 'bounty' that encourages private lawsuits seeking to assert legal rights." *Smith v. Wade*, 461 U.S. 30, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983) (Rehnquist, J., dissenting) (emphasis in original) (internal citations omitted). In *Wade*, the Supreme Court announced the proper standard to be considered in determining whether the imposition of punitive damages is appropriate. The Court held that a jury may impose punitive damages in a Section 1983 case not only when evil intent is demonstrated, but also when the defendant(s) exhibit reckless or callous indifference to the rights of others. *Id.* at 56, 103 S.Ct. at 1640. The petitioner, who was charged with a Section 1983 violation, argued that the most prudent test for punitive damages is one limited to "actual malicious intent—'ill will, spite or intent to injure.'" *Id.* at 37, 103 S.Ct. at 1630. After surveying state common law and finding that it more or less has expanded the application of punitive damages in tort cases to include conduct by defendant manifesting a reckless indifference to the rights of others, the Court stated, "we discern no reason why a person whose federally guaran-

teed rights have been violated should be granted a more restrictive remedy than a person asserting an ordinary tort cause of action." *Id.* at 48–49, 103 S.Ct. at 1636. Accordingly the Court concluded that punitive damages may be assessed "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Id.* at 56, 103 S.Ct. at 1640.

In this action, plaintiff has not asserted any facts which would demonstrate that defendant acted with malicious or evil intent, or with reckless or callous indifference to plaintiff's federal rights. Hence, the punitive damages demand as to the federal claims must be dismissed. Additionally, in finding that the underlying Section 1983, Fifth Amendment and Fourteenth Amendment claims shall be dismissed, a punitive damages request must receive the same fate.

### 2) Pendent State Claims

Pennsylvania courts have embraced the rule in Restatement (Second) of Torts which states: "Punitive Damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others." § 908(2), *quoted in, Feld v. Merriam*, 506 Pa. 383, 395, 485 A.2d 742, 747 (1984). As similar to the above standard involving federal rights, punitive damages may be awarded "when the act is done with reckless indifference, as well as, bad motive." *Delahanty v. First Pennsylvania Bank N.A.*, 318 Pa.Super. 90, 130, 464 A.2d 1243, 1263 (1983).

 In the case at bar, however, the court has dismissed all the state claims for failure to state a claim upon which relief may be granted. When this occurs, the Pennsylvania Supreme Court has opined,

Since punitive damages are an element of damages arising out of the initial cause of action, if that cause of action is dis-

---

**29.** Pertaining to the demand of punitive damages, the court must apply federal law to the federal claims (*i.e.* Hill–Burton Act, Section

1983, Fifth Amendment, and Fourteenth Amendment), and state law to the state claims (*i.e.* Third Party Beneficiary and CPL).

missed, the punitive damages which are incident to actual damages cannot stand.

\* \* \* \* \* \*

If no cause of action exists, then no independent action exists for a claim of punitive damage since punitive damages is (sic) only an *element* of damages.

*Kirkbride v. Lisbon Contractors, Inc.,* 521 Pa. 97, 101, 555 A.2d 800, 802 (1989) (emphasis in original). Thus, "[i]t is essential ... that facts be established that, apart from punitive damages, are sufficient to maintain a cause of action." *Rhoads v. Heberling,* 306 Pa.Super. 35, 44, 451 A.2d 1378, 1383 (1982).

It then follows in this case that since the underlying cause of action for the pendent state claims has been dismissed, the punitive damages request surrounding those claims must be likewise dismissed in accordance with *Kirkbride.*[30]

Consequently, plaintiff's demand for punitive damages will be dismissed for failing to state a claim upon which relief may be granted.

---

[30]. Regarding punitive damages for the breach of contract claim, it is additionally dismissed based on Pennsylvania law dictating that punitive damages are not recoverable in a contract action. *See Tudor Dev. Group, Inc. v. United States Fidelity & Guar. Co.,* 692 F.Supp. 461, 466

(M.D.Pa.1988). Plaintiff relied on *Reliable Tire Distributors, Inc. v. Kelly Springfield Tire Co.,* 607 F.Supp. 361 (E.D.Pa.1985). That case, however, involved New Jersey law, which is not implicated in this suit.