Julian RIDLEN, Executor of the Estate
of Robert Shay, deceased, et al.,
Plaintiffs,

v.

FOUR COUNTY COUNSELING
CENTER, et al.,
Defendants.

No. S92–352S.

United States District Court,
N.D. Indiana,
South Bend Division.

Nov. 24, 1992.

Robert L. Justice, Logansport, IN, for plaintiffs.

Michael L. Carter, David J. Mallon, James V. Donadio, Richard A. Smikle, Steven J. Cohen, Indianapolis, IN, Edward N. Kalamaros, South Bend, IN, for defendants.

## MEMORANDUM AND ORDER

ALLEN SHARP, Chief Judge.

### I. INTRODUCTION

This case was filed by able and experienced counsel on June 10, 1992, purporting to assert claims under 42 U.S.C. § 1983 and inferentially to invoke this court's jurisdiction under 28 U.S.C. §§ 1331, 1343(a)(3) and (4). The defendants, also appearing by able and experienced counsel, have either filed motions to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure (Fed.R.Civ.P.), or motions for summary judgment under Rule 56, Fed.R.Civ.P. By order entered on October 9, 1992, the pending motions to dismiss were converted to motions for summary judgment under Rule 56, Fed.R.Civ.P. This court conducted an extensive hearing, dialogue and oral argument in Lafayette, Indiana on October 19, 1992. It was agreed that the issues were fully discussed there and fully briefed. The court granted the plaintiffs until October 30, 1992, to file any supplemental materials.

### II. BACKGROUND

In their Complaint, the plaintiffs allege two causes of action. In Count I, the plaintiffs allege a civil rights violation pursuant to 42 U.S.C. § 1983 and predicated on the Fourteenth Amendment to the Constitution of the United States. In Count II, the plaintiffs allege a pendant claim based on supplemental jurisdiction for medical negligence based on the Indiana Medical Malpractice Act. Jurisdiction over the state claim is based on the Judicial Improvements Act of 1990, codified at 28 U.S.C. § 1367. This statute permits jurisdiction over purely state law claims which "are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a).

This court surmises that a brief listing of the parties involved is in order. Robert Shay is deceased—he took his own life on July 2, 1990. The plaintiffs are Julian Ridlen, Executor of the estate of Robert Shay,

and Robert Shay's sons and heirs Matthew Shay, Roger Shay and Andrew Shay. Four County Counseling Center ("Four County") is a community mental health center and private psychiatric hospital incorporated under the laws of the State of Indiana as a not-for-profit corporation with its principal place of business in Logansport, Cass County, Indiana. Dr. Umamaheswara Kalapatapu ("Dr. Kalapatapu") is and was at all relevant times a physician practicing psychiatry and licensed to practice under the laws of the State of Indiana, and residing in and maintaining a practice in Logansport, Indiana.

On Wednesday, June 6, 1990, Roger Shay signed an application seeking to involuntarily commit his father, Robert Shay, to Four County. The application was accompanied by a physician's emergency statement signed by a member of the Four County staff attesting that Robert Shay may be mentally ill and dangerous. After the application and physician's emergency statement were presented to the Cass County Superior Court; an order was issued authorizing the immediate detention, examination and treatment of Robert Shay. On the evening of June 6, 1990, Robert Shay was admitted involuntarily to Four County. *See Indiana Code* § 16–14–9.1–7.

On June 11, 1990, the permitted seventy-two hour (excluding Saturdays and Sundays) statutory period for the involuntary commitment of mentally ill and dangerous persons expired. On that date, Robert Shay decided to remain at Four County as a voluntary patient. Accordingly, during the statutory committal period, the staff of Four County, in compliance with *Indiana Code* § 16–14–9.1–7, filed a report with the Cass County Superior Court indicating that Robert Shay had elected to continue treatment on a voluntary basis.

Robert Shay voluntarily continued his treatment at Four County from June 11, 1990 until June 13, 1990. On June 13, 1990, Robert Shay requested his release and agreed to outpatient treatment. On July 2, 1990, Robert Shay took his own life.

## III. SUMMARY JUDGMENT

■ Summary judgment is proper if the pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits, show that there exists no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *accord Juarez v. Ameritech Mobile Communications*, 957 F.2d 317, 320 (7th Cir.1992). A material question of fact is a question which will be outcome determinative of an issue in that case. *Wainwright Bank v. Railroadmens Federal Sav.*, 806 F.2d 146 (7th Cir.1986). While generally, "Summary Judgment is only appropriate when the record reveals that no reasonable jury could find for the nonmoving party, ... this general standard is applied with added rigor in employment discrimination cases, where intent is inevitably the central issue." *McCoy v. WGN Continental Broadcasting Co.*, 957 F.2d 368, 370–371 (7th Cir.1992) (citations omitted). Still, "[s]ummary judgment will not be defeated simply because issues of motive or intent are involved, and is proper when the plaintiff fails to indicate any motive or intent to support plaintiff's position." *Rush v. McDonald's Corp.*, 966 F.2d 1104, 1109 (7th Cir.1992) (quoting *Morgan v. Harris Trust & Savings Bank*, 867 F.2d 1023, 1026 (7th Cir.1989)). The most recent, thorough discussions of Rule 56 by the Supreme Court of the United States can be found in a trilogy of cases decided in 1986. *See Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); [1] and *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). *Celotex* addressed the initial burdens of the parties under Rule 56, and *Anderson* addressed the standards under which the record is to be analyzed within the structure of Rule 56.

■ After *Celotex*, it is clear that a non-moving party may not rest on its plead-

---

1. For the judicial epilogue of *Celotex*, see *Catrett v. Johns–Manville Sales Corp.*, 826 F.2d 33 (D.C.Cir.1987), *cert. denied*, 484 U.S. 1066, 108 S.Ct. 1028, 98 L.Ed.2d 992 (1988).

ings to avoid summary judgment. *Celotex*, 477 U.S. at 325–26, 106 S.Ct. at 2554. *See also, Lujan v. National Wildlife Federation*, 497 U.S. 871, 110 S.Ct. 3177, 111 L.Ed.2d 695 (7th Cir.1990); and *Zayre Corp. v. S.M. & R. Co.*, 882 F.2d 1145 (7th Cir.1989). "The days are gone, if they ever existed, when the nonmoving party could sit back and simply poke holes in the moving party's summary judgment motion." *Fitzpatrick v. Catholic Bishop of Chicago*, 916 F.2d 1254, 1256 (7th Cir.1990). The initial burden is on the moving party to demonstrate "with or without supporting affidavits" the absence of a genuine issue of material fact and that judgment, as a matter of law, should be granted in the moving party's favor. *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553 (quoting Rule 56). Once the moving party has met the initial burden, the opposing party must "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine [material] issue for trial.'" *Id.* Furthermore, in *Anderson*, the Court held that what facts are material in a specific case shall be determined by the substantive law controlling that case or issue. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. In addition, the Court went on to interpret Rule 56 as requiring that courts analyze summary judgment motions utilizing the standard of proof relevant to the specific case or issue. *Id.* at 252–55, 106 S.Ct. at 2512–13.

For academic insight into *Celotex* and *Anderson*, see Childress, *A New Era for Summary Judgments: Recent Shifts at the Supreme Court*, 116 F.R.D. 183, 194 (1987), where the author states:

> The recent Supreme Court cases likely require that summary judgment be more readily granted.... This emerging trend signals a new era for summary judgment, one in which the old presumptions are giving way to a policy of balancing and efficiency, and the mechanism is more appropriate to double as a sufficiency motion—allowing some sort of trial itself on the paper record.

More recently Childress has written that *Celotex* and *Anderson* clarify that Rule 56 motions

> should not be hesitantly granted when appropriate.... Any litigant dealing with summary judgment must be aware of this new trend, the Court's cases, their application in each circuit, and the direction they portend. Pretrial practice is a new ballgame.

Childress, *A Standards of Review Primer: Federal Civil Appeals*, 125 F.R.D. 319, 343 (1989).

Recent object lessons applying these ideas are found in *Kizer v. Children's Learning Ctr.*, 962 F.2d 608 (7th Cir.1992); *Karazanos v. Navistar Intern. Transp. Corp.*, 948 F.2d 332, 335 (7th Cir.1991); *Old Republic Ins. Co. v. Federal Crop Ins. Corp.*, 947 F.2d 269, 273–274 (7th Cir.1991); and *Un. Ass'n of Black Landscapers v. City of Milwaukee*, 916 F.2d 1261, 1265 (7th Cir.1990).

### IV. 42 U.S.C. § 1983

#### A. State Action

█ Title 42 U.S.C. § 1983 provides that: Every person who, under color of any statute, ordinance, regulation, custom, or usage, of an State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws shall be liable to the party injured ...

*Id.* In order to assert a valid § 1983 action, two allegations are required. Initially, the plaintiff must allege the deprivation of a federal right attributable to a certain person or entity. Next, the plaintiff must allege that the person who has deprived him of that right acted under color of state law. Specifically, § 1983 provides a cause of action only against persons who act "under color" of law. Essentially, the complained of action in a § 1983 case must be one that is "fairly attributable to the state," and not to a private actor. *Lugar v. Edmonson Oil Co.*, 457 U.S. 922, 937, 102 S.Ct. 2744, 2753, 73 L.Ed.2d 482 (1982).

█ To analyze whether the alleged state action or actor is viable for purposes of § 1983 litigation, the Supreme Court has

formulated the following tests: "(1) where the state and the private party or entity maintain a sufficiently interdependent or symbiotic relationship; (2) where the state requires, encourages, or is otherwise significantly involved in nominally private conduct; and (3) where the private person or entity exercises a traditional state function." 1 Sheldon H. Nahmod, *Civil Rights and Civil Liberties Litigation: The Law of Section 1983* § 2.04 (1991). It is only necessary for the § 1983 litigant to satisfy one of the aforementioned tests in order to establish the requisite state action. This task has proven rather arduous and the infinite caselaw on the topic illustrates that difficulty. It must also be noted that "[t]hese tests may not be the sole means for establishing state action" in light of *West v. Atkins*, 487 U.S. 42, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988), where the Supreme Court found state action "though not under specific, articulated theory." 1 Martin A. Schwartz & John E. Kirklin, *Section 1983 Litigation Claims, Defenses, and Fees* § 5.10 (1991).

Insofar as past is prologue, this court will briefly revisit the historical foundations of the state action doctrine. The Supreme Court initiated the state action epic in the *Civil Rights Cases*, 109 U.S. 3 (1883). Contrary to the dissenting thoughts of Justice Harlan in the *Civil Rights Cases, supra*, a majority of the Court indicated that in light of § 1 of the Fourteenth Amendment, state action was required to invoke the Constitutional guarantees of equal protection and due process. This view of state action represented the status quo until about World War II, when the Court began to expand the parameters of state action. *See* John E. Nowak, Ronald D. Rotunda, & J. Nelson Young, *Constitutional Law* Ch.

14, § 1. This increasingly expansive view of the state action doctrine is illustrated by the Supreme Court opinions of *Shelley v. Kraemer*, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948), *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961), and *Reitman v. Mulkey*, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967). In true Hegelian form, these cases gave way to a more defined stricter view of state action coinciding with the changing personnel on the Court under Chief Justices Warren, Burger, and Rehnquist respectively.[2] There is a trilogy of Supreme Court cases decided in 1982 that need to be examined for purposes of determining the requirement of state action. They are *Rendell–Baker v. Kohn*, 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982). *Blum v. Yaretsky*, 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982), and *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982).

The Supreme Court in *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982), held that conduct constituting state action for purposes of the Fourteenth Amendment due process clause is also conduct "under color of state law" for purposes of § 1983 actions. The *Lugar* Court established a two-part standard for determining whether conduct by a "private" actor can be considered state action:

> First, the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible ... Second, the party charged with the deprivation must be a person who may fairly be said to be a state actor. This may be because he has acted together

**2.** In 1 Martin A. Schwartz & John E. Kirklin, *Section 1983 Litigation Claims, Defenses, and Fees* § 5.10 (1991), the authors explain the state action doctrine and history in the following fashion:

> In furtherance of its goals of eradicating societal racial discrimination, the Warren Court took an expansive view of state action, bringing within the Fourteenth Amendment a wide array of racially discriminatory actions based upon their involvement or relationship with

state or local government. The Burger and Rehnquist Courts, more concerned with protecting nonconstitutional sphere, reversed this trend so severely that, as early as 1979, one authority concluded that state action is "the clearest area of conservatism on the part of the Burger Court and the most unqualified reversal of position from that adhered to by the" Warren Court.

*Id.*

with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the State. *Id.* at 937, 102 S.Ct. at 2753-54.

In *Blum v. Yaretsky*, 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982), the Court evaluated private health care facilities subject to strict governmental regulation for purposes of state action. In *Blum*, residents of a privately operated nursing home brought a class action against the Commissioner of the New York State Department of Public Services when the residents' private physicians and the administrators of the nursing homes decided to downgrade the residents' medicaid patient status gradations. Subsequently, state officials reduced the benefits to those individuals transferred to lower levels of care under the state's Medicaid regulations. The residents sought to block the physicians and nursing home administrators from transferring Medicaid patients to lower levels of care, alleging a violation of their rights secured by the Fourteenth Amendment.

In *Blum*, 457 U.S. 991, 1004-12, 102 S.Ct. 2777, 2785-90, the Court identified three factors to be considered in the evaluation of the state action issue. First, there must be a "sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the later may fairly be treated as that of the State itself." *Id.* The aforementioned nexus must be such that the state "has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State" *Id.* Finally, the entity has exercised powers "that are traditionally the exclusive prerogatives of the State." *Id.*

In the application of the abovementioned factors, the *Blum* Court specifically concentrated on the decision to downgrade the level of care rather than the overall relationship between the facility and the state. The *Blum* Court also considered the fact that the state subsidized the nursing homes, paid the expenses of patients and licensed and extensively regulated the homes. Insofar as the nursing home's de-terminations regarding patient transfers and discharges were made in their capacity as a private entity and rendered in accordance with private professional, not state-mandated standards, the Court held that the state action requirement was not satisfied. Specifically, the Court explained that the state's requirement that the physicians complete a form stating the reason for the transfer is not the equivalent of state responsibility for the physician's decision. *Id.* at 1007-1008, 102 S.Ct. at 2787-88. Additionally, the *Blum* Court noted that the "coercive power or encouragement" element of state action could not be met as the regulations imposed by the state on the nursing home did not dictate when a patient is to be discharged or transferred. *Id.* at 1008, 102 S.Ct. at 2788. "Those decisions ultimately turn on medical judgments made by private parties according to professional standards that are not established by the State" *Id.* at 1008, 102 S.Ct. at 2788. Finally, the Court stated that it was unable to conclude that nursing homes perform a function that has been traditionally the exclusive prerogative of the State. *Id.* at 1011, 102 S.Ct. at 2789.

In *Rendell–Baker v. Kohn*, 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982), the Court examined the relationship between a private school and the state of Massachusetts for state action when several discharged teachers initiated a § 1983 action for employment discrimination. Specifically, the discharged teachers sued a nonprofit, privately operated school that had contracted with the state to provide educational services to difficult and disruptive students. The school received nearly all of its funding from public sources and was extensively regulated in personnel matters by state-imposed administrative guidelines. Despite the pronounced levels of state involvement and the matrix of state regulations, the Court refused to designate the firings as state action because they were not "compelled or even influenced by any state regulation." *Id.* at 842-43, 102 S.Ct. at 2771. Furthermore, even in light of a contract with the state, the *Rendell–Baker* Court held that the acts of certain private organizations do not become state action.

Earlier this year, the Supreme Court of the United States revisited the question of state action vis-a-vis immunity in *Wyatt v. Cole,* —— U.S. ——, 112 S.Ct. 1827, 118 L.Ed.2d 504 (1992). Justice O'Connor, speaking for the Court, provided an object lesson in careful examination of whether there is acting under color of state law as earlier defined in *Lugar v. Edmundson Oil Co.,* 457 U.S. 922, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982). Upon examining the concurring opinion of Justice Kennedy joined by Justice Scalia and the dissenting opinion of the Chief Justice joined by Justices Souter and Thomas, it is apparent that this court must look with extreme care as to whether the state action requirement has been met.

### 1. Health Care Facilities

In § 1983 cases, "the state action issue arises in myriad circumstances, and each case must be analyzed on the basis of its specific facts." "While public hospitals unquestionably engage in state action, private hospitals are consistently held not to be state actors even if they participate in the Hill–Burton and Medicaid and Medicare programs, each of which provides member hospitals with substantial governmental funding and subjects them to extensive state regulation." [3] *Id.* This court must evaluate the state action issue in light of the notion that this inquiry is very fact specific.

In *Spencer v. Lee,* 864 F.2d 1376 (7th Cir.1989) (en banc), *cert. denied,* 494 U.S. 1016, 110 S.Ct. 1317, 108 L.Ed.2d 493 (1990), the Seventh Circuit, speaking through Judge Posner, gave extensive consideration to the state action issue presented in the § 1983 context and predicated on facts similar to those at issue here. In *Spencer,* the court considered the ramifications of a private physician invoking the involuntary committal process of a patient pursuant to the Illinois Mental Health and Developmental Disabilities Code. In compliance with the law, the physician authorized the patient's committal, and the plaintiff was later arrested, detained and invol-

---

**3.** In 1 Martin A. Schwartz & John E. Kirklin, *Section 1983 Litigation Claims, Defenses, and Fees* § 5.10 (1991), the authors have collected numerous examples of this proposition in a footnote:

*Albright v. Longview Police Dep't,* 884 F.2d 835 (5th Cir.1989) (hospital county-owned, but operated by private, nonprofit, tax-exempt corporation; no state action); *Wong v. Stripling,* 881 F.2d 200, 202 (5th Cir.1989) ("hospital's executive committee did not perform a traditional state function in revoking Dr. Wong's staff privileges"); *Tunca v. Lutheran Gen. Hosp.,* 844 F.2d 411 (7th Cir.1988) (private hospital's denial of staff privileges is not state action); *Pariser v. Christian Health Care Sys.,* 816 F.2d 1248 (8th Cir.1987) (private hospital's suspension of medical staff privileges; not state action); *Sarin v. Samaritan Health Center,* 813 F.2d 755 (6th Cir.1987) (private hospital's revocation of staff privileges; no state action); *Ezpeleta v. Sisters of Mercy Health Corp.,* 800 F.2d 199 [119] (7th Cir.1986) (private hospital's termination of staff privileges; no state action) *Carter v. Norfolk Community Hosp. Ass'n.,* 761 F.2d 970 (4th Cir. 1985); *Mendez v. Belton,* 739 F.2d 15 (1st Cir.1984); *Lubin v. Crittendon Hosp. Ass'n.,* 713 F.2d 414 (8th Cir.1983), cert. denied, 465 U.S. 1025, 104 S.Ct. 1282, 79 L.Ed.2d 685 (1984); *Newson [Newsom] v. Vanderbilt Univ.,* 653 F.2d 1100 (6th Cir.1981); *Modaber v. Culpepper [Culpeper] Memorial Hosp.,* 674 F.2d 1023 (4th Cir.1982); *Schlein v. Milford Hosp.,* 561 F.2d 427 (2d Cir.1977); see also *Jarrell v. Chemical Dependency Unit,* 791 F.2d 373 (5th Cir.1986) (defendant's provision of treatment not state action).

Additionally, the authors list several new cases in the Supplement:

The Seventh Circuit ruled that a private organization which provided mental health services to a county jail was not engaged in state action when it fired a jail counselor. There was no joint action ... and *West v. Atkins,* 487 U.S. 42 [108 S.Ct. 2250, 101 L.Ed.2d 40] (1988) was distinguished as a case in which the plaintiff was an inmate complaining about the lack of adequate medical care ... *Cunningham v. Southlake Center for Mental Health,* 924 F.2d 106 (7th Cir.1991).

The Tenth Circuit held that a mental health center's discharge of employees did not constitute state action. *MacDonald v. Eastern Wyoming Mental Health Center,* 941 F.2d 1115 (10th Cir.1991).

\* \* \*

A federal district court determined that a hospital that received funding through participation in the Hill–Burton hospital program was not engaged in state action. *White v. Moses Taylor Hospital,* 763 F.Supp. 776 (M.D.Pa.1991).

A federal district court ruled that the provision of health care by a private hospital is not an exclusively governmental function. *Mitchell v. Chontos,* 756 F.Supp. 243 (D.S.C.1990). *Id.*

untarily treated. In *Spencer,* The patient-plaintiff sued the physician for deprivation of his liberty without due process of the law, stating that the physician was "deputized" by the state per the Illinois Mental Health and Developmental Disabilities Code to carry out the exclusive state function of committing the mentally ill.

The *Spencer* court examined the state action issue in a detailed fashion outlining the history of private commitment of the mentally ill and evaluating the language of the statute. The court explained that there was no state action for purposes of an involuntary commitment proceeding. The *Spencer* court stated that the plaintiff cannot seriously allege that "the relevant provisions of the Mental Health code were enacted because the state wants to encourage commitments, any more than state repossession laws are passed because states want to encourage creditors to repossess their debtors' goods." *Id.* at 1379. Moreover, the court reasoned the "the treatment of the mentally disabled ... as of the sick and infirm generally, is not [the exclusive function of the State.]" *Id.* at 1379. The court concluded by explaining that "[t]he pressure to transform state common law torts into federal constitutional torts comes from ... the availability of attorney's fee awards in civil rights suits under 42 U.S.C.A. section 1988 ... *Id.* at 1382. Accordingly, the *Spencer* court affirmed the dismissal of the claims based on the state action analysis.

Recently, the Eleventh Circuit addressed a very similar situation in *Harvey v. Harvey,* 949 F.2d 1127 (11th Cir.1992). In *Harvey,* the court evaluated the ramifications of a husband seeking to have his wife involuntarily committed according to Georgia law. In so doing, the husband invoked the services of a certain physician. After the physician examined the wife and concluded that she was mentally ill, the physician "directed the police to pick up [the wife] and take her to ... a private hospital which had been designated as an emergency receiving and evaluating facility for involuntarily committed mental health patients." *Id.* at 1129. Next, the husband and his lawyer "obtained an order from ...

[a court] appointing [the husband] as his wife's emergency guardian." *Id.* The wife filed a § 1983 suit against all of the abovementioned parties alleging certain violations of her constitutional rights.

In evaluating the state action issue, the *Harvey* court invoked the reasoning in *Spencer, supra.* First, based on the state compulsion test, the *Harvey* court explained that the involuntary committal statute did not compel or encourage involuntary commitments. Next, after outlining the Supreme Court decisions which had previously concluded that "such nexus is lacking in circumstances much more compelling than the circumstances of this case," the *Harvey* court indicated that there was no state action based on "the nexus/joint action test." *Id.* at 1130–1131. Finally, the *Harvey* court opined that involuntary commitments are "not a function so reserved to the state that actions under the commitment statute transform a private actor into a state actor." *Id.* Insofar as the requisite state action was absent, the *Harvey* court affirmed the dismissal of the plaintiff's claim. Finally, the *Harvey* court noted that:

> At most, the ... statute functions as a licensing provision enabling the hospital to receive mental patients; licensing and regulation are not enough to transform private hospitals into state actors for section 1983 purposes. To hold otherwise would expose private hospitals and private physicians to section 1983 liability whenever they act pursuant to ... [a] commitment statute, despite the fact their actions ultimately reflect medical judgments made according to professional standards that are not established by the state.

*Id.* at 1132 (citations omitted).

### 2. Voluntary Committal

■ Four County is a private, not for profit corporation authorized to exist under the laws of the State of Indiana, and provides a species of community mental health services on an emergency, inpatient and outpatient basis. Additionally, Four County has clients that come to it as private

patients and pay for the services with a wide variety of private insurance and/or publicly provided funds from Medicare or Medicaid. Patients are also sent to the facility of Four County by court order. This court must first look to the conduct of these defendants just before and at the time of the death of Robert Shay. In this regard, it is perhaps best to attach as an appendix hereto rhetorical paragraphs one through twenty of that complaint. Certainly, the complaint must be examined liberally in favor of the pleader, although the above cited authorities dealing with Rule 56 impose some burdens to come forward by the opponent of the motion for summary judgment.

Many years have passed since the Supreme Court, speaking through Justice Douglas, issued the encompassing and ubiquitous decision in *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), and it is still axiomatic that this court's view of § 1983 "should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions." *Id.* at 187, 81 S.Ct. at 484. Here, in order to evaluate this action, this court must conclude that the alleged constitutional violation at issue stems from the voluntary detention procedures. This is an issue of proximate cause. For § 1983 "authorizes the imposition of liability *only* upon a defendant who 'subjects, or causes to be subjected, any citizen ... or other person ... to the deprivation of any rights' protected by federal law." 1 Martin A. Schwartz & John E. Kirklin, *Section 1983 Litigation Claims, Defenses, and Fees* § 6.3 (1991). Furthermore, "in

*Martinez v. California*, 444 U.S. 277 [100 S.Ct. 553, 62 L.Ed.2d 481] *reh'g denied*, 445 U.S. 920 [100 S.Ct. 1285, 63 L.Ed.2d 606] (1980), the Supreme Court determined that a defendant's conduct must have a sufficiently close relationship to the claimed violation of the plaintiff's rights in order to conclude that the defendant's 'subjected' the plaintiff 'to the deprivation' of federally protected rights." *Id.* "*Martinez* thus imposes a proximate cause requirement for establishing § 1983 liability." *Id.* Therefore, the only logical point to begin this evaluation is with the voluntary detention proceedings.

The actions of Dr. Kalapatapu, a private physician, and Four County, a private hospital[4], in receiving Robert Shay and thereafter treating, detaining and discharging him in response to his demand, did not involve state action, especially in light of *Blum, Spencer,* and *Harvey, supra*. It is an undisputed fact in this record that after the expiration of the statutory period permitted for involuntary commitment, Robert Shay voluntarily chose to remain in Four County as a patient on June 11, 1990. In compliance with *Indiana Code* § 16-14-9.1-7, the staff of Four County filed a report with the Superior Court of Cass County, Indiana relating that Robert Shay had elected to continue treatment on a voluntary basis. On June 13, 1990, Robert Shay demanded his release and agreed to outpatient treatment. It was 19 days after his release from Four County that Robert Shay took his own life at his home.

This court notes that the holdings and reasoning in *Spencer* applies, *a fortiori*, in

---

4. In *Harvey v. Harvey*, 949 F.2d 1127, 1129–30 (11th Cir.1992), for purposes of § 1983, the court ruled that a private hospital could not be liable for the harmful actions of physicians employed at said hospital because of the prohibition against respondeat superior. This court finds that rationale applicable to Four Counties. Specifically, the *Harvey* court explained:

A defendant cannot be held liable under section 1983 on a respondeat superior or vicarious liability basis. *Monell v. Department of Social Serv.*, 436 U.S. 658 [98 S.Ct. 2018, 56 L.Ed.2d 611] (1978). *Monell* involved a municipal corporation, but every circuit court to consider the issue has extended the holding to

private corporations as well. See *Lux by Lux v. Hansen*, 886 F.2d 1064, 1067 (8th Cir.1989) (private mental health center); *Iskander v. Village of Forest Park*, 690 F.2d 126, 128 (7th Cir.1982) (department store); *Powell v. Shopco Laurel Co.*, 678 F.2d 504, 506 (4th Cir.1982) (security guard employer); *see also Jones v. Preuit & Mauldin*, 851 F.2d 1321, 1325 (11th Cir.1988) (en banc), vacated on other grounds, 489 U.S. 1002 [109 S.Ct. 1105, 103 L.Ed.2d 170] (1989) (private defendants in 42 U.S.C. section 1983 actions should have at minimum same defenses available to public defendants). ... The hospital cannot be faulted for the conduct of its employees. *Id.*

voluntary detention cases because of the very obvious differences between voluntary and involuntary detention. Judge Posner spoke for a clear majority of the Court of Appeals which is the same as the present court with one addition. The reasoning and result is also clear. The en banc majority failed to find state action. That result is clear. The factual setting of that case is only marginally different from this one and that case represents both precedent and authority for the result reached and announced here.

This court must consider the aforementioned facts in light of *Spencer* and the aforementioned state action tests: "(1) where the state and the private party or entity maintain a sufficiently interdependent or symbiotic relationship [5]; (2) where the state requires, encourages, or is otherwise significantly involved in nominally private conduct; and (3) where the private person or entity exercises a traditional state function." Sheldon H. Nahmod, *Civil Rights and Civil Liberties Litigation: The Law of Section 1983* § 2.04.

The first line of attack by plaintiffs' counsel relates to the fact that there was an order of court which played some preliminary role in this plaintiffs' decedent being in this private medical facility. At the very most, that court order is entirely incidental. There is no question that state court orders can in a wide variety of settings constitute state action. *See, e.g., Shelley v. Kraemer,* 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948). Since the court order here in question was entirely incidental to the substantive claims that are here asserted, it is far too slender a reed upon which to base federal question jurisdiction.

The argument involving judicial participation relies on the "governmental involvement and nexus" test and several variables must be evaluated. The defendants argue

that the only connection the physicians have with the state law is that they acted as allowed by state law and maintain that that is not sufficient to convert them to state actors. To support this argument, the defendants argue that as explained in *Spencer, supra,* if the aforementioned facts could constitute state action, then "any creditor who repossess a chattel or person making a citizen's arrest as allowed by law would be considered a state actor." *Id.* This argument fails to include the very important fact that the defendants had to present the voluntary detention order to the Superior Court of Cass County.

In *Spencer,* the court indicated that the use of court proceedings to safeguard the detention and commitment process does not elevate the process to that of state action. Specifically, as pointed out by the defendant, the *Spencer* court explained that the "[plaintiff] relies on the statute [ (Illinois Mental Health and Developmental Disabilities Code) ] to make the defendants state actors[, b]ut a private commitment is no more state action than a citizen's arrest, the repossession of chattel, or the ejection of trespassers is." *Id.* The *Spencer* court extrapolates on this evaluation by reference to *Dahl v. Akin,* 630 F.2d 277, 279 (5th Cir.1980), *cert. denied,* 451 U.S. 908, 101 S.Ct. 1977, 68 L.Ed.2d 296 and *Del's Big Saver Foods, Inc. v. Carpenter Cook, Inc.,* 795 F.2d 1344 (7th Cir.1986). In *Dahl,* to evaluate a § 1983 action based on a procedural due process violation, the court held that "a daughter's use of a civil commitment statute to institutionalize her father" through the use of court proceedings was not state action.[6] *Dahl,* 630 F.2d at 279. Furthermore, by pointing out the contrast in *Del's Big Saver Foods, Inc., supra,* the *Spencer* court conveys the point that the use of court proceedings in commitment statutes are not sufficient for the establishment of state action.

---

**5.** It is not necessary for this court to discuss the "symbiotic relationship" test to any degree because the under these facts and this test, state action could not be established.

**6.** In *Harvey,* 949 F.2d at 1133, the court also refers to *Dahl* for this same holding. Specifically, the *Harvey* court indicated "private persons

... who act pursuant to state statutes to commit the mentally ill cannot be held liable under section 1983. *See Dahl v. Akin,* 630 F.2d 277, 281 n. 3 (5th Cir.1980) (because statute allowed any adult person to initiate commitment proceedings, actual initiator could not be assumed to have acted in official capacity)." *Id.*

It is important to note that the *Spencer* court also refers to *Hall v. Quillen*, 631 F.2d 1154 (4th Cir.1980), *cert. denied*, 454 U.S. 1141, 102 S.Ct. 999, 71 L.Ed.2d 293 and indicated that "[t]he other courts that have addressed this issue agree with our position." *Spencer*, 864 F.2d at 1377. In *Hall*, the court analyzed the § 1983 liability of a judge, a physician, and an attorney in an action based on an involuntary commitment. The *Hall* court indicated that "the initial and threshold issue ... [is] whether a state-appointed counsel or physician can be liable under § 1983 in an action in federal court, or, otherwise stated, is the representation by counsel and the action of the physician in such a situation state action?" *Hall*, 631 F.2d at 1155. The *Hall* court answered this rhetorical question in the negative and indicated "[this] is a question that other circuit courts, with complete unanimity, have answered by declaring unequivocally that there is a lack of state action in such a situation, and consequently, no liability under § 1983" *Id.* If the state-appointed counsel and physician were not state actors in *Hall*, then certainly the private physicians at Four Counties are not state actors.

Clearly much has transpired in the area of state action jurisprudence since the *Hall* court rendered the aforementioned opinion in 1980. The *Hall* decision is quite persuasive, however, when it is viewed against the state action jurisprudence since 1980. The persuasiveness stems from the fact that the state action doctrine has been narrowed considerably by the numerous decisions rendered by the Burger and Rehnquist Courts, especially in § 1983 actions. Therefore, it would be a inconsistent and unsound to find state action in 1992 after the state action doctrine has been narrowed in such a fashion. It is also very important to note the *Spencer* court's reliance on this case has very obvious ramifications on this district court.

This notion is further affirmed in *Harvey*, 949 F.2d at 1127, where the court indicated "[i]n *Spencer*, not only the majority but also the dissent apparently agreed that members of the general citizenry cannot be considered state actors when they decide to institutionalize a patient." *Id.* In the opinion by Judge Ripple, concurring in part and dissenting in part with the majority's decision in *Spencer*, there is a discussion of this issue as well:

> The simple invocation of state legal procedures, standing alone, does not constitute joint participation or conspiracy with state officials. *See Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 939 n. 21 [102 S.Ct. 2744, 2755 n. 21, 73 L.Ed.2d 482] (1982). Therefore, even on the basis of this ... complaint, we can conclude that the decision of the family and the physician to seek involuntary commitment is not action attributable to the state. The state neither commands nor encouraged such private initiative. *See Blum v. Yaretsky*, 457 U.S. 991, 1004 [102 S.Ct. 2777, 2785, 73 L.Ed.2d 534] (1982). The state merely provides an opportunity for these private parties to seek relief through the judicial process. "Mere approval of or acquiescence in the initiatives of a private party is not sufficient to justify holding the State responsible for those initiatives under the terms of the Fourteenth Amendment." *Blum*, 457 U.S. at 1004–05, 102 S.Ct. at 2786.

*Id.*

To be sure, the plaintiff cannot rely on the argument that extensive state regulation is viable for state action purposes. This clearly does not comport with the abovementioned Supreme Court cases in this area. In fact, in much more compelling circumstances, the Court held that there was no state action. *See Blum v. Yaretsky*, 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982); *Rendell–Baker v. Kohn*, 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982). Another facet of this state action test asks whether the state compelled or significantly encouraged the physicians to participate in the voluntary commitment process. There is certainly no evidence or for that matter any cogent argument that can be asserted to suggest that a voluntary provision can be invoked in a compulsory fashion or to significantly encourage. Therefore, under the "govern-

ment involvement and nexus" test, there is no state action.

Nor can the plaintiff rely on the public function test for purposes of state action. In the *Spencer* decision, it is certainly beyond dispute that Judge Posner fully evaluated the complexities of the involuntary detention process and the ramifications on the public function test for state action. For purposes of voluntary detention, the public function test is not satisfied for the same reasons that involuntary commitments are not traditionally within the exclusive prerogative of the state. The public function test requires that a private actor perform a function within the exclusive prerogatives of the state. The *Spencer* court thoroughly evaluated the treatment of the mentally ill and concluded that such treatment is not a power that is traditionally the exclusive prerogative of the state. In so doing, the *Spencer* court indicated:

> [C]ommitment has long been a private remedy, albeit one subject (like repossession, self-defense, citizen's arrest, and other infringements on rights of liberty or property) to rigorous safeguards. Even public commitment ... is private in a sense, because the state requires relatives of voluntarily committed mental patients alike to pay the cost of their upkeep in the state's institutions, and it allows the involuntarily committed to be placed in private homes as well as public and private hospitals.

> \* \* \* \* \* \*

> Private commitment was not novel in 1893; nor was it invented in [this state]. According to Blackstone, writing in 1765, "On the first attack of lunacy, or other occasional insanity, while there may be hope of a speedy restitution of reason, it is usual to confine the unhappy objects in private custody under the direction of their nearest friends and relations." 1 Commentaries on the Laws of England 305.

*Id.* at 1380–81. This court notes that all of the abovementioned points apply to the Indiana statutes pertaining to the voluntary commitment process, all of which mili-

tates against a finding of state action based on the public function test. Clearly, the public function test has not been met.

■ The plaintiff asserts an argument for purposes of state action, which is based on a provision of the Constitution of the State of Indiana. This argument requires separate evaluation because it tangentially invokes both the public function test and the "governmental involvement and nexus" test. Specifically, the plaintiff refers to Article IX of the Constitution of the State of Indiana states "[i]t shall be the duty of the General Assembly to provide, by law, for the support of institutions for the education of the deaf, the mute, and the blind, and for the treatment of the insane." The argument runs that because of this provision in the Constitution of the State of Indiana, those private organizations that are engaged in treating mental health problems are in effect engaging in so-called state action. To be sure, the mere fact that this private medical facility receives state and federal funds from sources such as Medicare and Medicaid, as well as public welfare sources, does not in and of itself convert this private medical organization into a public one that engages in state action.

When one looks seriously at the argument that the plaintiffs attempt to extrapolate from the aforesaid provision in the Indiana Constitution, the fallacy of the same in the context of this case becomes very apparent. This court knows judicially that in the State of Indiana, many hospitals, clinics and other medical facilities that are private for profit, and private not-for-profit corporations organized under the laws of Indiana engage in a wide variety of treatment of the various dimensions of mental illness and mental health problems. This court does not believe that the concept of state action as embedded in the Fourteenth Amendment of the Constitution of the United States and as required in § 1983 is designed to reach to all of that species of private medical conduct and turn the same into state action, so that damage claims regarding the same can be filed in a United States district court and be within the fed-

eral question subject matter jurisdiction of that court. Such a rationalization would automatically federalize virtually all medical malpractice claims that are in the mental health area of treatment.

To put it candidly but not disrespectfully, if this rationalization to increase the federal question jurisdiction of this court is to be expanded in the fashion that has just been suggested, it is not going to be done so by this court at this level of the federal judiciary. Again, not disrespectfully, this court is going to have to be told by a binding higher federal court authority that this kind of case is subject to the federal question jurisdiction of this court. It is the clear intent of this ruling to squarely confront the questions that have been presented and to squarely deny that this court has federal question jurisdiction in this case.

Therefore, based on the Seventh Circuit's analysis in *Spencer* as applied to the voluntary commitment provisions, as well as the similar provisions examined in the other cited cases, this court concludes that the voluntary commitment of a person to a mental hospital pursuant to Indiana law and under the directive of a court order commanding that person's detention does not extend the color of law to actions of private physicians and private hospitals in respecting and acknowledging that order. There is a failure to establish a key element of this court's federal question jurisdiction. However, in the interest of great caution, the court will deal briefly with additional issues that are presented.

## B. Constitutional Issues

■ In reliance upon *Youngberg v. Romeo*, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), the plaintiffs maintain that when the father, Robert Shay, was placed in Four County's custody, he had a Fourteenth Amendment right to necessary treatment. The Due Process Clause of the Fourteenth Amendment provides that "no state shall ... deprive any person of life, liberty, or property, without due process of law." Recent caselaw, especially *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), "reflect a deeply entrenched belief that the Constitution is a charter of negative liberties—rights that restrain the government, not a creator of affirmative rights to government services or resources."[7]

The facts in *DeShaney* are, as stated by Chief Justice Rehnquist, "undeniably tragic." *Id.* 109 S.Ct. at 1001. In *DeShaney*, the Supreme Court indicated that:

> The petitioner is a boy who was beaten and permanently injured by his father, with whom he lived. The respondents are social workers and other local officials who received complaints that petitioner was being abused by his father and had reason to believe that this was the case, but nonetheless did not act to remove petitioner from his father's custody. Petitioner sued respondents claiming that their failure to act deprived him of his liberty in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

*Id.*

In evaluating this § 1983 action, the *DeShaney* Court's explanation of the Due Process Clause of the Fourteenth Amendment is instructive:

> [N]othing in the language of the Due Process Clause itself requires the state to protect the life, liberty, and property of its citizens against invasion by private actors. The Clause is phrased as a limi-

---

7. Erwin Chemerinsky, *Federal Jurisdiction and Supp.* § 8.9 (1990). Additionally, in *Archie v. City of Racine*, 847 F.2d 1211 (7th Cir.1988), *cert. denied*, 489 U.S. 1065, 109 S.Ct. 1338, 103 L.Ed.2d 809 (1989), the court concluded that the Constitution in general, and the Due Process Clause in particular:

> [I]s a charter of negative rather than positive liberties ... The men who wrote the Bill of Rights were not concerned that government

might do too little for the people but that it might do too much for them. The Fourteenth Amendment adopted in 1868 at the height of laissez-faire thinking, sought to protect Americans from oppression by state government, not to secure them basic governmental services.

*Id.* at 1220 (citing *Jackson v. City of Joliet*, 715 F.2d 1200, 1203 (7th Cir.1983)).

tation on the State's power to act, not as a guarantee of certain minimum levels of safety and security. It forbids the State itself to deprive individuals of life, liberty or property without the "due process of law," but its language cannot fairly extend to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means. Nor does history support such an expansive reading of the Constitutional text. Like its counterpart in the Fifth Amendment, the Due Process Clause of the Fourteenth Amendment was to prevent government "from abusing [its] power, or employing it as an instrument of oppression," ... Consistent with these principles, our cases have recognized that the Due Process Clauses generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty or property interest of which the government may not deprive the individual.

*Id.* at 195–96, 109 S.Ct. at 1003. (citations and parenthetical omitted) Based on this holding, the Court indicated that the above-mentioned facts were not actionable for purposes of a § 1983 suit.

Recently, in *Monahan v. Dorchester Counseling Center, Inc.*, 961 F.2d 987 (1st Cir.1992), the First Circuit analyzed facts similar to those at issue here. In doing so, the *Monahan* court invoked the logic and holdings in *DeShaney, supra.* In *Monahan*, the plaintiff voluntarily committed himself to Millie's Cottage, a group home for the mentally ill operated in conjunction with the Massachusetts Department of Mental Health. *Id.* at 988 n. 1. Apparently, when the plaintiff had anxiety attacks, the staff from Millie's Cottage would transport him by van for treatment at the Dr. John C. Corrigan Mental Health Center ("Corrigan"), "a treatment facility for the mentally ill operated by the Massachusetts Department of Mental Health." *Id.* On April 1, 1989, the plaintiff jumped out of the van on the way to Corrigan twice; and with the assistance of Corrigan campus police, the plaintiff was finally presented and evaluated at Corrigan.

A similar event occurred on April 6, 1989. Again, after making suicidal statements and experiencing an anxiety attack, the plaintiff was again driven to Corrigan. After the plaintiff was evaluated, a crisis intervention staff worker refused to admit him as an in-patient at Corrigan. *Id.* at 989. A staff member from Cottage, David Kazen ("Kazen"), prepared to transport the plaintiff back to Cottage, and the situation went awry. The *Monahan* court described the events in this fashion:

> Kazen escorted him back into the van. While the van was parked, [the plaintiff] said he did not want to return to Millie's Cottage and jumped out. Kazen and [the plaintiff] went back inside the Corrigan facility, and [the plaintiff] again asked to be admitted. [The crisis intervention staff member at Corrigan] refused to admit him, and Kazen and [the plaintiff] returned to the van.

> \* \* \* \* \* \*

> While en route to the Millie's Cottage, the van stopped at a stoplight. [The plaintiff] jumped out and began walking down the off ramp of an interstate highway. Kazen, instead of notifying the police or attempting to stop [the plaintiff], returned to the Millie's Cottage. There, he called [Corrigan], and two other Millie's Cottage workers were dispatched to look for the [plaintiff]. Before they arrived, [the plaintiff] was struck by a car and severely injured.

*Id.*

In *Monahan*, the plaintiff's complaint had twenty different counts both federal and state. Here, the specific concern of this court is the plaintiff's § 1983 action against the abovementioned defendants predicated upon a violation of the plaintiff's substantive due process rights. In evaluating this claim, the *Monahan* court explained:

> In *Youngberg v. Romeo*, 457 U.S. 307, 324 [102 S.Ct. 2452, 2462, 73 L.Ed.2d 28] (1982), the Supreme Court held that a mental patient *involuntarily committed* to a state hospital enjoyed "constitutionally protected interests in conditions of reasonable care and safety, reasonably

nonrestrictive confinement conditions, and such training as may be required by these interests." On the other hand, in *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189 [109 S.Ct. 998, 103 L.Ed.2d 249] (1989), the Court held that county officials did not violate a young boy's due process rights when, in spite of repeated warnings, they failed to take action to protect the boy from beatings by his father.

\* \* \* \* \* \*

[The plaintiff's] status falls somewhere between that of the plaintiffs in *Youngberg* and *DeShaney*. He was not involuntarily committed, as was the plaintiff in *Youngberg*. However, he did live for six days in a facility administered by (or at least on behalf of) the Commonwealth [of Massachusetts]. His relationship to the state was therefore considerably closer than that of the plaintiff in *DeShaney*, who lived in a private home. The latter factual distinction notwithstanding, we think this case is governed by the rationale of *DeShaney*.

*Id.* at 990.

This plaintiff, like the plaintiff in *Monahan*, "argues that once the state provided psychiatric care to him, it initiated a special relationship with him which obligated the state to take affirmative steps to ensure his well-being." *Monahan*, 770 F.Supp. 43, 46 (D.Mass.1991). Here, as in *Monahan*, the *DeShaney* opinion is instructive and dispositive. "[W]hen the State takes a person into its custody and *holds him there against his will*, the constitution imposes upon it a corresponding duty to assume some responsibilities for his safety and general well being." *DeShaney*, 109 S.Ct. at 1005–06. Here, as in *Monahan*, the plaintiff was not so situated "because the state did not commit [the plaintiff] involuntarily, it did not take an 'affirmative act' of restraining his liberty, an act which may trigger a corresponding due process duty to assume a special relationship for his protection." *Monahan*, 961 F.2d at 991. This court concurs with the *Monahan* court's summation:

It follows from *DeShaney* that [the plaintiff] has failed to state a viable claim for denial of substantive due process. Even if some of all of the defendants were found to have acted with 'deliberate indifference' to [the petitioner's] needs in failing properly to treat and manage him, so as to render him vulnerable ..., their misconduct violated no constitutional duty. [The petitioner's] remedies, like those of most others in similar situations, lie in the arena of tort, not constitutional law.

*Id.* at 990–91. Here, under these facts, the plaintiff has failed to assert an actionable constitutional violation.

C. State of Mind Requirement

██ Following the establishment of an actionable constitutional violation, the § 1983 plaintiff must also allege the requisite state of mind prescribed by the asserted constitutional violation, and the alleged state of mind must be attributable to the respective defendant. To the extent that these plaintiffs are attempting to bottom any claim under this court's federal question jurisdiction on negligence, the same is clearly foreclosed under *Davidson v. Cannon*, 474 U.S. 344, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986), and *Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). Although this court does not find it necessary to evaluate this requirement, the burden with reference to the federal question jurisdiction claim would be deliberate indifference. *See Monahan v. Dorchester Counseling Center, Inc.*, 961 F.2d 987 (1st Cir.1992) (requiring deliberate indifference). The basic standard of deliberate indifference is found in *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). *See also Pacelli v. DeVito*, 972 F.2d 871 (7th Cir.1992), *Swofford v. Mandrell*, 969 F.2d 547 (7th Cir.1992), *Duane v. Lane*, 959 F.2d 673 (7th Cir.1992), *Jackson v. Duckworth*, 955 F.2d 21 (7th Cir.1992), *McGill v. Duckworth*, 944 F.2d 344 (7th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1265, 117 L.Ed.2d 493 (1992), *Wallace v. Robinson*, 940 F.2d 243 (7th Cir.1991), *Salazar v. Chicago*, 940 F.2d 233 (7th Cir.1991), *Holmes v.*

**1358**

*Sheahan,* 930 F.2d 1196 (7th Cir.1991), *Goka v. Bobbitt,* 862 F.2d 646, 650 (7th Cir.1988), and *Felders v. Miller,* 776 F.Supp. 424 (N.D.Ind.1991). *See also Musgrove v. Broglin,* 651 F.Supp. 769 (N.D.Ind. 1986); and *Burris v. Kirkpatrick,* 649 F.Supp. 740 (N.D.Ind.1986).

**D. Eleventh Amendment and Immunity Concerns**

 Even if, however, these plaintiffs should be able to keep this federal courthouse door open for this claim under § 1983, and to in effect turn these mental health providers into state actors, it certainly could be argued that these state actors at least in their official capacities, are subject to the immunity of the Eleventh Amendment of the Constitution of the United States. In their official capacities, each of the state defendants are entitled to immunity for claims for money damages under the Eleventh Amendment to the Constitution of the United States. The Eleventh Amendment states as follows:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

*See Kashani v. Purdue University,* 813 F.2d 843 (7th Cir.), *cert. denied,* 484 U.S. 846, 108 S.Ct. 141, 98 L.Ed.2d 97 (1987); *Owen v. Lash,* 682 F.2d 648 (7th Cir.1982); *Sheets v. Indiana Department of Corrections,* 656 F.Supp. 733 (S.D.Ind.1986). For recent authority consistent with *Kashani,* 813 F.2d at 843, see *Shelton v. Trustees of Indiana University,* 891 F.2d 165 (7th Cir. 1989). *See also Kroll v. Board of Trustees of the University of Illinois,* 934 F.2d 904 (7th Cir.1991); *Cosby v. Jackson,* 741 F.Supp. 740 (N.D.Ill.1990), and *Rodenbeck v. Indiana, Leaking Underground Storage Tank Div. etc.,* 742 F.Supp. 1442 (N.D.Ind.1990). Any and all damage claims against the defendants in their official capacities are now DISMISSED under the mandates of the Eleventh Amendment of the Constitution.

There are undeveloped issues relating to the immunity of certain defendants as well. It is correct that the individual physicians, although perhaps not Four County itself, would have qualified immunity. *See Hedge v. County of Tippecanoe,* 890 F.2d 4 (7th Cir.1989). Judge Miller ably and fully covered that subject in *Sherman v. Four County Counseling Center,* S90–452(RLM) in his excellent Memorandum and Order dated February 18, 1992, which has been presented in full to this court. Earlier this year, the Supreme Court of the United States evaluated the immunity issue in *Wyatt v. Cole,* —— U.S. ——, 112 S.Ct. 1827. Under the Chief Justice's dissent, the private party physicians in this case would have absolute immunity to any claims based on federal question jurisdiction. It is a somewhat closer question as to whether the concurring opinion of Justice Kennedy, joined by Justice Scalia, would require the same result. There are clear indications that it would. Even under the opinion of Justice O'Connor, it is likely that the two individual physicians would be immune. Again, the court need not resolve that issue on this date.

**V. CONCLUSION**

Again, it needs to be emphasized that there is no possible basis for jurisdiction in this case under 28 U.S.C. § 1332, diversity of citizenship. The question then comes as to whether there is jurisdiction under 28 U.S.C. § 1331 or 1343(3) or (4). The claim here is alleged under 42 U.S.C. § 1983, and from the civil rights cases decided at 109 U.S. 3 (1883), to *West v. Akins,* 487 U.S. 42, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988), there has always been some requirement for state action with reference to claims presented in a United States district court under § 1983. To be sure, the state action requirement which finds its genesis in the language of the Fourteenth Amendment, has been subject to a considerable variety of judicial interpretation since 1883. Fundamentally, this case is a claim for medical malpractice which should be decided on the basis of well developed substantive statutory and case law in the State of Indiana.

Insofar as the plaintiff has failed to effectuate a claim under federal law, the state law claim is without an independent basis for jurisdiction. Therefore, this court declines to exercise pendent jurisdiction over this claim. Therefore, any claim under the Indiana Medical Malpractice Act, Indiana Code 16–9.5–10–2 should proceed under Indiana state law with reference to medical malpractice in a state court. Therefore, all of the claims here based on federal question jurisdiction are DISMISSED WITH PREJUDICE. All claims based on the substantive law of Indiana are DISMISSED WITHOUT PREJUDICE, so they can be appropriately prosecuted in a state court having appropriate jurisdiction there over.

IT IS SO ORDERED.

## APPENDIX

### FACTS

1. In 1989, Robert Shay, a locomotive engineer employed by the Norfolk and Southern Railroad began acting strangely, hearing voices, entertaining paranoid delusions that "Catholics" were out to kill him, and believing he had psychic powers. He suffered from insomnia and extreme restlessness and drank heavily. He was put on sick leave by his employer. Mr. Shay made various extraordinary and peculiar demands on his three sons Roger, Andrew and Matthew, including requests to drive him to distant locations for bizarre purposes. He attempted suicide by turning on the gas stove in his residence with the pilot light extinguished. He asked for a gun to kill himself.

2. His sons became concerned and contacted Defendant Four County.

3. Under the direction and upon the advice of the staff of Four County, Roger Shay on June 6, 1990, signed an *Application for Emergency Detention of Mentally Ill and Dangerous Person* (a pre-printed state form) which alleged Robert Shay suffered from a psychiatric disorder which substantially disturbed his thinking, feeling or behavior and impaired his ability to function, that he was believed to be dangerous to himself because of threats to kill himself, and that, if not immediately restrained, he would harm or kill himself.

4. Attached to the *Application* was a *Physician's Emergency Statement* (also a pre-printed state form) signed by Dr. Sitha Gita Kalapatapu, a member of the Four County staff which alleged that Robert Shay "may be mentally ill and dangerous" and that in her opinion he needs inpatient psychiatric evaluation and treatment. The *Physician's Emergency Statement* further said these statements were based upon information given by Deb Pherson, RN (another member of the Four County staff).

5. Later that day the Cass Superior Court issued an *Endorsement by Judicial Officer Authorized to Issue Warrants for Arrest* authorizing the detention, examination and treatment of Robert Shay at Four County.

6. That evening Robert Shay was involuntarily admitted to Four County pursuant to the *Endorsement*.

7. Both before and after his father's admission, Roger Shay told members of the Four County staff about his father's bizarre behavior and threats and attempts to harm himself. He emphasized to them that his father needed help badly.

8. On June 7 one of Mr. Shay's sons called Four County and told the staff that Mr. Shay was very intelligent and very manipulative and that when he said "Everything is fine" everything was not necessarily fine at all.

9. While at Four County, Mr. Shay admitted feeling he was psychic and that he sometimes heard the voice of God. He admitted feelings of paranoia and said he needed to "decellerate" his brain. He admitted thinking about killing himself.

10. Defendant Brignoni examined Mr. Shay and wrote a *Psychiatric Report* on June 7. In that report he diagnosed Mr. Shay as

296.24 Major depression, single
R/O Schizophrenia, chronic
R/O alcohol abuse.

11. Mr. Shay was examined by Defendant Umamaheswara Kalapatapu who pre-

scribed Halcion for him. He was given this medication on June 8, 9, 10, 11, and 12.

12. Halcion is a psycho-active drug which was manufactured and placed in the stream of commerce by The Upjohn Company.

13. Halcion is a defective and dangerous product in normal use in that, in itself and also in combination with alcohol it has serious side effects both during medication and following withdrawal, including inducing depression, violence and harm to self and in that it was at that time marketed without adequate warnings.

14. On June 11, 1990, Robert Shay elected to remain at Four County as a voluntary patient. That same day a *Report Following Emergency Detention* was filed with Cass Superior Court by Jayme Grostefon, the designee of the chief officer of Four County, relating that Robert Shay had elected to continue treatment on a voluntary basis.

15. At this time and at any later time Four County could have commenced commitment proceedings so as to have Robert Shay involuntarily and immediately detained. At this time and at all later times Four County had probable cause to believe Mr. Shay was mentally ill, dangerous, and in need of immediate hospitalization. Had commitment proceedings been commenced, Mr. Shay would have been immediately and involuntarily detained at Four County.

16. On June 13, Four County learned that Mr. Shay did not have insurance coverage.

17. Robert Shay remained at Four County until June 13, 1990, when he demanded to be released. Stating that release was against medical advice ("AMA"), Dr. Brignoni released him. At that time the diagnosis was

296.24 Major depression, single

R/O Schizophrenia, chronic

Dr. Brignoni recommended Mr. Shay be involved in outpatient substance abuse treatment but made no recommendation regarding treatment of his depression. Mr.

Shay was not stabilized from a psychiatric point of view.

18. After his release, Mr. Shay visited his personal physician, Dr. Robert Brewer and received a prescription for Halcion on June 15. He requested and received a renewal of this prescription on June 20. Mr. Shay told Dr. Brewer he was only sleeping two or three hours a night.

19. On June 20 Mr. Shay visited Four County even though he had no appointment. On June 21 he appeared for his first appointment for substance abuse treatment, but thereafter on June 22, 25, 26, 27, 28, and 29 he failed to keep appointments. After June 21 Mr. Shay never again contacted Four County.

20. On July 2, 1990, Mr. Shay locked himself in the bathroom of his home, cut both his wrists with razor blades, and bled to death. He was forty-seven years of age. His son Matthew and Andrew discovered his body.